HELLER *v.* CHICAGO & GRAND TRUNK RAILWAY CO.

109    53
125   532
109    53
s66NW 667
s63ASR541n
133   ¹637!
109    53
f137  114
109    53
139   ²596
139   ¹599

1. Common Carriers—Transportation of Live Stock.

   A railroad company, in carrying live stock, is not chargeable with the common-law liability of a common carrier, but is only bound to transport with ordinary prudence, skill, and care, and with reasonable dispatch.

2. Same—Custom—Care Taker.

   It is the custom of shippers of live stock to send a care taker with the stock, and, in the absence of an agreement on the part of the carrier to perform the duties of a care taker, a shipper assumes all risks arising from his failure to comply with such custom.

3. Same—Negligence—Burden of Proof.

   It is incumbent upon the plaintiff in an action for injuries to live stock during shipment to show what injury, if any, resulted after the act of negligence by the company upon which the claim for recovery is based, where it appears that most, if not all, of the injury was done before such act.

4. SAME—PLEADING—SUFFICIENCY OF DECLARATION.

    Whether the plaintiff in such an action can recover for a specific negligent act, known to him at the time of bringing suit, without alleging the same in his declaration,—*quære*.

5. NEGLIGENCE—INSTRUCTIONS TO JURY—DUTY OF COURT.

    Where several grounds of negligence are alleged in the declaration, and there can be no recovery upon some of them, the court, in instructing the jury, should eliminate such from their consideration.

Error to Saginaw; McKnight, J. Submitted January 28, 1896. Decided March 31, 1896.

Case by Gustav Heller against the Chicago & Grand Trunk Railway Company for injury to cattle shipped over defendant's road. From a judgment for plaintiff, defendant brings error. Reversed.

Plaintiff's firm, of which he is the survivor, purchased some cattle at the stock yards in Chicago. His agent ordered a car from the defendant company in which to ship them. The car was furnished, and was 33 feet long and 8 feet wide upon the inside. Into this car were loaded 24 steers, weighing 25,800 pounds, or 1,075 pounds each. The defendant was not responsible for the loading. Plaintiff could put in as many or as few cattle as he chose. The car was to be shipped over the defendant's road to Flint, Mich., and from thence over the Flint & Père Marquette Railway to Saginaw. The usual time for the performance of the journey was from 24 to 32 hours. The loaded car was then delivered to the defendant for transportation. The train consisted of 24 cars, the others being loaded with hogs. The car left Chicago at 2:30 p. m., March 14th, and reached Saginaw at 4:15 a. m., March 16th. Plaintiff furnished no man to accompany the cattle and take care of them on the route. The train was supplied with air brakes, the same as are in use on passenger trains, so that stops and starts could be made with as little jar or jerk as possible. On arriv-

ing at a station called "Haslett Park," toward noon of the 15th, the conductor discovered that three of the cattle were down, and that they all appeared restless and uneasy. He testified that the car was overloaded, that he wired the superintendent for a larger car, and asked for instructions. On arriving at Bancroft, 19 miles farther, about noon, in obedience to instructions, this car of cattle was sidetracked, the cattle taken out, watered, fed, and rested 11 hours, a larger car furnished, the cattle loaded in it, and the journey completed. Before arriving at Bancroft one steer had died. His body was removed, and it was reloaded in the large car with the other cattle, and shipped to Saginaw. The cattle were delivered in bad condition, their flesh bruised, some ribs broken, and one dead. Plaintiff brought suit to recover damages for the injury, and obtained a verdict of $150.

The declaration contains six counts, some based upon the common-law liability of the defendant as a common carrier, and others based upon alleged negligence. The court, in its instructions, eliminated the counts as to the common-law liability, and left it to the jury to determine, under the first two counts, whether the defendant was guilty of negligence which caused the injury. These two counts are substantially the same. On account of the importance of the case, we quote the allegation of negligence in full. It is as follows:

" Yet the said defendant, not regarding its said duty in that behalf, did not carry and convey said cattle in said car of said defendant from said Chicago to said Saginaw, with such reasonable dispatch and care, and did not feed, water, and properly care for the same, but wholly failed and neglected so to do. That said cattle, after being so placed in said car at said Chicago at said time, to wit, 7 o'clock in the forenoon of the 14th day of March, 1893, were carried, and said car was hauled, negligently, and with such want of reasonable care and dispatch, by said defendant, from said Chicago to said Saginaw, that said car did not arrive at said Saginaw until, to wit, 10 o'clock in the forenoon of the 16th day of March, 1893; and that said defendant, contriving and willfully intending to

injure and defraud the said Gustav Heller, surviving partner of Mary Hubert and Gustav Heller, as aforesaid, negligently and carelessly, and without reasonable dispatch, hauled said car, containing said cattle, from said Chicago to said Saginaw, without devoting any care or attention to said cattle whatever, without food, water, change of position, or care. Said cattle had not been fed or watered since leaving said Chicago as aforesaid, and could not, owing to their position in said car, lie down. That the weather during all of said time was extremely cold; that said cattle were continuously in said car from said 7 o'clock of the forenoon of said 14th day of March, 1893, until 10 o'clock in the forenoon of the 16th day of March, 1893, without food, water, care, or opportunity to lie down, and without adequate protection from the extreme cold, and, owing to their number, were during all that time in a cramped and uncomfortable position in said car; and that said cattle, by reason of such neglect and delay in transportation as aforesaid, and want of food, water, and care, and long confinement in said car in said cramped and uncomfortable position, and without any fault or negligence on the part of said Gustav Heller, surviving partner of the said Mary Hubert and Gustav Heller, suffered greatly thereby, and became, by reason of said cold weather, want of food, water, room, and care, sick, sore, lame, weak, bruised, jammed, gored, ribs broken, and disordered, and so remained for a long space of time, to wit, from thence hitherto, and became and were greatly reduced in value. And by reason of the neglect and delay of defendant in transporting said cattle as aforesaid, and the sickness and suffering occasioned by the delay, and by said cold and want of food, water, and care, as aforesaid, one of said cattle of and belonging to said Gustav Heller, surviving partner of said Mary Hubert and Gustav Heller, aforesaid, and of the value of $55, was found dead when said car arrived at Saginaw as aforesaid. Six other cattle were badly bruised all over, jammed, gored, and their ribs broken, and damaged to the extent of $180. Thirteen others were jammed, bruised, gored, and lacerated, and in a weak, damaged, and dying condition, and damaged to the extent of $135."

The fact is established beyond controversy that it is customary for shippers of live stock to send a man with the train to look after their cattle, to keep them upon

their feet, and to attend to watering and feeding them. No neglect is shown in the management of the train, unless it is to be inferred from the fact of the injury to the animals. There was no collision, and those in charge of the train testified that it was run in the usual manner, and without accident, from Chicago to Flint.

*L. C. Stanley* (*E. W. Meddaugh* and *Geer & Williams*, of counsel), for appellant.

*Ferdinand Brucker* and *Chauncey H. Gage*, for appellee.

GRANT, J. (*after stating the facts*). It is of importance to state what grounds of negligence are set forth in the declaration. They are as follows:

1. Delay in transit.
2. Failure to feed, water, and properly care for them.
3. In keeping them in the car from 7 o'clock on March 14th until 10 o'clock on March 16th, without food, water, care, or opportunity to lie down, and without adequate protection from the cold.
4. Placing them in the car in a cramped and uncomfortable position.

The declaration, in summing up the cause of the injury, states that it was "occasioned by the delay, and by said cold, and want of food, water, care, and room."

Upon these allegations, or some of them, must rest the plaintiff's right of recovery.

We will first note those which must be eliminated:

(*a*) Plaintiff suffered nothing by delay, and did not upon the trial, and does not now, ask recovery upon that basis.

(*b*) The cattle were not kept in the car, as charged, but were removed and fed and watered within the time required by the interstate commerce law of the United States. Rev. Stat. U. S. § 4386. They were properly watered and fed. Those in charge of the cattle at Ban-

croft so testified. There is no evidence to the contrary, and nothing to impeach the witnesses.

(c) He cannot recover for want of room. If the car was overloaded, this was his own fault. Plaintiff conceded this, and claimed that the car was not overloaded. The court properly instructed the jury that, if overloading was the cause of the injury, plaintiff could not recover.

(d) Defendant was not responsible for any injury from the cold weather, nor was there any evidence that the cattle suffered from the cold.

There is, therefore, left only the question whether the defendant performed its duty in properly caring for the animals, for want of care is the only basis upon which a recovery can be had. It is not alleged or claimed that there was negligence in the management of the train. This brings us to the important questions: What risk did plaintiff assume? And what duty did defendant owe to plaintiff in the care of the property committed to it for transportation? The court instructed the jury that the defendant was not liable as a common carrier. Such has been the rule in this State for the last 25 years. *Michigan Southern, etc., R. Co.* v. *McDonough,* 21 Mich. 165. The able opinion in that case was written by the late Mr. Justice CHRISTIANCY, and is exhaustive in both its reasoning and the authorities cited. While it is usually sufficient to refer to the authority, yet the reason there given is so cogent and forcible in its application to this case that I am constrained to quote parts of it:

"Animals have wants of their own to be supplied; and this is a mode of conveyance at which, from their nature and habits, most animals instinctively revolt; and cattle especially, crowded in a dense mass, frightened by the noise of the engine, the rattling, jolting, and frequent concussions of the cars, in their frenzy, injure each other by trampling, plunging, goring, or throwing down; and frequently, on long routes, their strength exhausted

by hunger and thirst, fatigue, and fright, the weak easily fall and are trampled upon, and, unless helped up, must soon die. Hogs, also, swelter and perish. It is a mode of transportation which, but for its necessity, would be gross cruelty, and indictable as such. The risk may be greatly lessened by care and vigilance, by feeding and watering at proper intervals, by getting up those that are down, and otherwise. But this imposes a degree of care and an amount of labor so different from what is required in reference to other kinds of property that I do not think this kind of property falls within the reasons upon which the common-law liability of common carriers was fixed."

The court further, in discussing what these carriers would naturally do if they were common carriers, or held themselves out as such, said that—

"They [the carriers] must employ a corps of men skilled in the care and management of stock, a business quite foreign in its character from that of operating a railroad, and they must make many other provisions to guard against injury and risk which are not required for other property generally transported by railroads.

"Now, we must shut our eyes to what is notorious to all business men, or we must take judicial notice, as I think we are bound to do, that *this is not the mode*, and such *are not the principles*, upon which this great and rapidly increasing business of transporting live stock to an Eastern market is generally, if at all, done upon the railroads of this State (if, in fact, in any other of the Western States).

"I think we are also bound to know that, if this business were done in this mode and upon these principles, and could be done in no other way, and the railroads were to be held responsible as insurers for all damages not caused by the act of God or the public enemies (which is strictly the common-law liability), or by the viciousness of some particular animal or animals in the mass, which would be a ludicrous distinction applied to a car load of cattle, or for all such as might be prevented by human agency, the railroad companies, to indemnify themselves against such risks and the extraordinary expenses of this mode of doing the business, must, of course, demand a much higher freight; and, if they can be compelled to carry at all in this way, they must provide themselves with all the conveniences I have

mentioned, and keep on hand a special corps of experienced stockmen; and, being compelled to keep them, and having gone to the expense of the necessary conveniences, it would then be for their interest to charge the higher freight *in all cases*, and refuse to carry upon any other terms. And, in this manner, those who would prefer to take the care and risk upon themselves for a lower freight would be deprived of the opportunity.

"The law of common carriers is founded mainly upon considerations of public policy, and these considerations, therefore, should not be overlooked. On the other hand, if the drover, with a sufficient force of his own men, experienced in the proper management of the cattle, goes upon the same train free of charge, in a drover's car, provided for that purpose, and has the entire charge, care, and management of the cattle, and the responsibility for care and injury incident to that mode of transportation, the company only furnishing the proper cars and motive power, and being responsible only for their sufficiency, and the proper mode of making up and running the train, it is manifest there will be much less liability to injury or loss, and that the companies can afford to carry the cattle at greatly reduced rates. This, undoubtedly, is the mode, substantially, in which this branch of business is carried on generally upon the railroads of this State, and probably other Western States, so far as relates to the transportation of cattle to an Eastern market,—sometimes by special contract, setting forth the terms, as in a bill of lading, receipt, or ticket, and sometimes only by the uniform course of business as adopted by the company, and acted upon by their employers."

Plaintiff assumed all the ordinary risks of transportation, and all injury which resulted from the cramped and crowded condition of the cattle, from their restiveness, viciousness, exhaustion, hunger, and thirst during their transportation, and also from the jars and concussions incident to starting and stopping the train.

The defendant owed the duty to transport the car and its contents with ordinary prudence, skill, and care, and with reasonable dispatch. It was understood, and was a part of the contract, that the car was to be transported within the usual time of from 24 to 32 hours, and that the defendant was under no obligation to unload,

water, and feed the cattle if transported within that time. Upon ascertaining that plaintiff had no one in charge of the cattle, it would undoubtedly have been the duty of the defendant to unload and water and feed them when, from any cause, it was unable to transport and deliver them within the usual time. The defendant, upon ascertaining the condition of the cattle (whether because the conductor found that he could not deliver them within the usual time, or not, is immaterial), unloaded and took care of the cattle in a proper manner. In doing this it performed its entire duty towards the plaintiff.

The court instructed the jury that the custom of the shipper to send a care taker was universal, that it was established beyond controversy, that it applied to this case, that it became a part of the contract, and that plaintiff was bound by it. The court failed to instruct the jury as to the effect of this custom. The plaintiff assumed all those risks and injuries resulting from his failure to comply with this custom to send a care taker. One of the principal reasons why some one should be employed to keep constant watch of animals, while in these cars, is that it is dangerous for one to lie down. It is therefore necessary that all be kept standing, and, if one gets down, that he should be gotten up as soon as possible. The danger from one lying down is apparent. He is apt to be trampled upon, his flesh bruised and bones broken, and he is also a constant menace to those that are standing. The plaintiff not only did not send such a care taker, but he did not request the defendant to assume such care, did not notify it that he was sending no care taker, nor request its agents in charge of the train to exercise any supervision or care over them. He therefore assumed all the risks from the failure upon his part to comply with the custom. This custom was recognized by this court as early as 1867. *McMillan* v. *Railroad Co.*, 16 Mich. 109. The conductor and brakemen of this train had other constant

and important duties to perform in its management. To impose upon them the additional duty of looking after 24 cars of live stock, and to see that the animals were kept in proper condition and position, would be unreasonable, and not a duty assumed by this defendant. The rates of transportation are fixed with a view to the universal custom that the shipper must perform this duty, if he desires it to be performed, or make a special contract with the carrier to do so. *Kimball* v. *Railroad Co.*, 26 Vt. 258. Now, it is evident that such a care taker could have watched these cattle, and prevented this injury, whether they were overloaded or not. For this neglect the plaintiff alone is responsible, and it bars his recovery. In *German* v. *Railroad Co.*, 38 Iowa, 127, the defendant was held liable because it shipped some of the plaintiff's cars without notice to him, and thus prevented him from accompanying them as he intended. The defendant was properly held liable for not taking the care which the owner would have taken, had he not been prevented from accompanying the train.

It is insisted by the defendant that this car was overloaded, that this caused the injury, and that such overloading was negligence *per se*. As already shown, the plaintiff alone was responsible for the manner of loading. Nine witnesses, experienced in the transportation of cattle, testified that the car was overloaded. The plaintiff, his agent who shipped them, and two other witnesses gave their opinions that the car was not overloaded. The plaintiff admitted that it would have been impossible to get another animal into the car. One of plaintiff's witnesses had had experience from 1871 to 1876, in the summer time, in shipping and driving cattle in the Indian Territory. His impression was that the cars which were then used were 33 feet long, but he said he might be mistaken. He would not say that even 27 cattle were too many to put in such a car. He also testified that it would be dangerous to ship cattle without some one in charge of them. The conductor,

upon investigation, determined that the car was too small, and put his company to the expense of sending a larger one with which to complete the journey. *Aside from the opinions of the witnesses, the fact is that, when these cattle were placed in the customary manner, crosswise of the car, each one had only 16 1-2 inches in which to stand, and that, whether standing crosswise or in any other manner, each animal had but 11 square feet of room.* It requires the opinion of no witness to inform us that each animal was more than 16½ inches in thickness, and that they could not stand in this crowded condition without their ribs being compressed within a space less than their natural limits. Animals so situated are completely helpless, and the weaker ones must soon become exhausted, and fall down. One had died, and the two others which were down lay apparently lifeless, before they had been in transit 24 hours. Speaking for myself, I do not hesitate to say that such loading was negligence *per se*, and, under the laws of this State, would be indictable as cruelty to animals. Inasmuch, however, as the determination of this question is not essential, and some of my brethren are of the opinion that there was a conflict of evidence, which was proper for the determination of the jury, we do not pass upon it. Under the case made by the evidence, the court should, as requested, have directed a verdict for the defendant.

It is contended that it was negligence for the defendant to place the body of the dead steer in the car at Bancroft, and that injury resulted from this act. It is evident that most of the injury was done before the original car reached Bancroft, and, as already stated, the plaintiff was responsible for this. It is impossible to determine what, if any, injury was caused after the car left Bancroft. If this act was negligence, it was clearly the duty of the plaintiff to show what injury, if any, resulted therefrom. He could not, in any event, recover for an injury, part of which was caused by his own neglect, without showing

that which resulted from defendant's subsequent negligence. No such act of negligence is alleged, and *quœre* whether he can recover without alleging it. Plaintiff knew the position of this dead animal in the car when delivered, and, knowing it, there is much force in the position that he should have alleged it.

In the event of a new trial, it is proper to note some other errors that were committed, upon the basis that a case may be made which should be left to the jury. The court failed to instruct the jury, as it should have done, what acts charged in the declaration should be eliminated from their consideration. The court left it to the jury upon the general statement that the defendant was liable "if it did not give that care to the cattle which it should have given, and did not handle them with that degree of care to convey them safely and without injury." Where a declaration contains several grounds of negligence, it is the duty of the court to instruct the jury as to those upon which, alone, recovery can be based, and to eliminate the others. The court should, as requested, have instructed the jury that the defendant did not undertake to render the additional service of watching and starting the cattle up, so as to prevent any sinking down and getting under the feet of the others, or prevent their unduly crowding and injuring one another; that plaintiff assumed any damage or loss that might be occasioned by want of an attendant, and also all that resulted from the nature, restiveness, and viciousness of the animals.

The judgment must be reversed, and a new trial ordered.

LONG, C. J., HOOKER and MOORE, JJ., concurred with GRANT, J. MONTGOMERY, J., concurred in the result.