WEAVER *v*. ANN ARBOR RAILROAD CO.

1. CARRIERS—LIVE STOCK—PERSONS IN CHARGE.

   A person designated by the shipper, and accepted by the carrier, to take charge of a shipment of live stock, is a "bona fide employé" of the shipper, within the meaning of those words as used in the contract of carriage, though he has not theretofore been in the shipper's employ and receives no other compensation than his passage to the destination of the shipment.

2. SAME—EVIDENCE—SUFFICIENCY.

   On the issue of whether decedent, killed while riding on a drover's pass, was in charge of a shipment of cattle, evidence examined and *held*, sufficient to justify a finding that he was actually placed in charge of the cattle by the shipper with the understanding that he should do whatever was necessary in caring for them.

3. SAME—PASSENGER—PERSON RIDING ON DROVER'S PASS—NEGLIGENCE—LIMITATION OF LIABILITY—CONTRACT.

   A person rightfully riding on a drover's pass is a passenger for hire, and his release of liability for damages on account of the negligence of the carrier is invalid.

Error to Gratiot; Stone, J. Submitted January 20, 1905. (Docket No. 96.) Decided April 4, 1905.

Case by Lizzie Weaver, administratrix of the estate of John H. Weaver, deceased, against the Ann Arbor Railroad Company for the negligent killing of plaintiff's intestate. There was judgment for plaintiff, and defendant brings error. Affirmed.

*Alexander L. Smith*, for appellant.

*Julius B. Kirby*, for appellee.

BLAIR, J. This writ of error is prosecuted to reverse a judgment of the circuit court of Gratiot county in favor of the plaintiff, as administratrix of the estate of John H.

Weaver, deceased, in an action brought against the defendant railway company for injuries received by said decedent, caused by the negligence of the defendant, and from which he subsequently died. The action was brought under the survival act. At the close of the plaintiff's evidence defendant made a motion for a verdict on the pleadings and proofs, which the court overruled, and defendant excepted. The defendant offered no testimony. The case was thereupon submitted to a jury, which returned a verdict for plaintiff, on which judgment was entered. There is no dispute about the facts in the case. The errors assigned are the action of the court in overruling the motion above mentioned, in refusing to give in the charge to the jury two requests of the defendant, and error in the charge as given.

Plaintiff's decedent, John H. Weaver, was, at the time of the accident causing his death, being transported on a freight train of defendant, which was at said time standing within what are known as "yard limits" of the station at Ashley, a village on the line of the defendant railroad. He was in the caboose at the rear of said train, which was a south-bound train, known as "No. 33." The accident occurred shortly before midnight on the 29th of January, 1904. The accident was caused by another south-bound freight train of defendant, known as "No. 41," coming into the yard or station limits at Ashley, and running into the caboose in which plaintiff was, wrecking that car, and causing a hay car in front of it to be derailed and upset upon plaintiff's body, injuring him so severely that he died within a short time thereafter. The accident was due to the negligence of the engineer of train No. 41 in failing to keep his train under control when coming into yard or station limits, as required by a rule of the company.

The declaration avers that plaintiff's intestate was being transported as a passenger for hire. In proof of this allegation there was offered in evidence of the right of said Weaver as a passenger on defendant's train a paper

found upon his body after his death. This document is designated a "limited liability live stock contract." It was a written contract entered into by the railroad company and certain shippers of live stock, Messrs. Altenburg & Van Buskirk, providing for the transportation of 28 head of cattle from Ithaca, Mich., to Black Rock (near Buffalo), N. Y. Ithaca is a station on the defendant's railroad a short distance north of Ashley. Under the contract the shippers had the right to accompany, or have an employé accompany, the stock, to take care of the same. The transportation of the man in charge was without other money consideration than the sum paid for the transportation of the stock.

The contract contained, among others, the following provisions:

"That the said shipper is, at his own sole risk and expense, to load and take care of and to feed and water said stock whilst being transported, whether delayed in transit or otherwise, and to unload the same, and neither said carrier nor any connecting carrier is to be under any liability or duty with reference thereto, except in the actual transportation of the same. * * *

" That said shipper shall see that all doors and openings in said car or cars are at all times so closed and fastened as to prevent the escape therefrom of any of said stock, and said carrier or any connecting carrier shall not be liable on account of the escape of any of said stock from said car or cars. * * *

" That no claim for damages which may accrue to the said shipper under this contract shall be allowed or paid by the said carrier, or sued for in any court by the said shipper, unless a claim for such loss or damage shall be made in writing, verified by the affidavit of the said shipper or his agent, etc. * * *

" And it is further agreed by said shipper that, in consideration of the premises and of the carriage of a person or persons in charge of said stock upon a freight train of said carrier or its connecting carriers without charge other than the sum paid or to be paid for the transportation of the live stock in charge of which he is, the said shipper shall and will indemnify and save harmless said carrier and every connecting carrier from all claims, liabilities, and de-

mands of every kind, nature, and description, by reason of personal injury sustained by said person or persons so in charge of said stock, whether the same be caused by the negligence of said carrier or any connecting carrier, or any of its or their employés, or otherwise.  *  *  *

"And Altenburg & Van Buskirk does hereby acknowledge that he had the option of shipping the above described live stock at a higher rate of freight according to the official tariffs, classifications, and rules of the said carrier and connecting carriers, and thereby receiving the security of the liability of the said carrier and connecting railroad, and transportation companies as common carriers of the said live stock upon their respective roads and lines, but has voluntarily decided to ship same under this contract at the reduced rate of freight above first mentioned.

"ANN ARBOR RAILROAD COMPANY,
"By E. W. ANGELL, Station Agent.
"Witness my hand,
"ALTENBURG & VAN BUSKIRK, Shipper.
"By————, Shipper's Agent.
"E. W. ANGELL, Witness.
"(See back for release for man in charge.)"

Upon the back of the contract appeared the following:

"Form 258.    Live stock contract:
"From Ithaca, Mich., to Black Rock, N. Y., via M. C. R. R.
"Date Jany 29th, '04.    Shipper, Altenburg & Van B.; consignee, do., ac Bun. W. B. Nos. M. C. 31 and M. C. 32; car Nos. M. C. 7991, T. C. S. D. 20836.
"Parties actually in charge of and accompanying within named stock are required to write their own names in ink here.

"JOHN WEAVER.
"Men in charge have written their own names above.
"E. W. ANGELL; Forwarding Agent.
"Ithaca, Mich., Station.
"Note—Agents will permit only the signature of owners or bona fide employés, who accompany the stock, to be entered on back of contract, without regard to passes allowed by number of cars, and run a pen through the remaining lines.

"JOHN WEAVER.
"I hereby sign my name as a means of identifying myself as original signer of this contract.

"JOHN WEAVER.

" Agents will fill in the blank spaces in face of contract in accordance with rates, weights, and conditions, as provided in tariffs and classifications, or such instructions as may be issued from time to time.

" The names of persons who are actually entitled to pass free with stock must be entered on the waybill, and which, when certified to by the agent, is the authority for the conductor to pass them.

" No return passes will be given.

" Agents will permit only the names of owners, or bona fide employés who accompany the stock, to be entered on waybill, without regard to passage allowed by number of cars.

" Agents are expected to adhere strictly to the rules in regard to the loading of mixed cars of stock, checking of shipments, examination of cars and doors, and the affording of proper facilities for the care of stock to parties in charge of same.

. " This contract must be signed in duplicate in all cases; the shipper to

" Release for man or men in charge.

" In consideration of the carriage of the undersigned upon a freight train of the carrier or carriers named in the within contract, without charge, other than the sum paid or to be paid for the carriage upon said freight train of the live stock mentioned in said contract, of which live stock I am in charge, the undersigned do hereby voluntarily assume all risk of accidents or damage to his person or property, and do hereby release and discharge the said carrier or carriers from every and all claims, liabilities, and demands of every kind, nature, and description, for or on account of any personal injury or damage of any kind sustained by the undersigned so in charge of said stock, whether the same be caused by the negligence of the said carrier or carriers, or any of its or their employés, or otherwise.

"JOHN H. WEAVER,

"Signature of man in charge.

"E. W. ANGELL, Witness."

Defendant contends that:

" John Weaver was not a passenger for hire, as claimed by plaintiff. In fact and law he was really a trespasser, to whom defendant owed no duty except to abstain from injuring him by wanton or willful acts. * * *

"The contract offered by plaintiff as the evidence of his right to be carried as a passenger contained, in the very paragraph signed by Weaver, a provision that it was intended only for bona fide employés. And in this paragraph, as well as in the release signed by him, the validity of which we shall discuss further on, he, in effect, represents and certifies that he is a bona fide employé of the shippers, in charge of their stock. That such was not the fact was well known to him and the shippers. It was not known to the railway company's agent. And, if it had been, the contract, on its face, shows that the agent was authorized to issue the pass only to bona fide employés of the shippers. In fact, the whole transaction was a fraud on the company. The privilege of sending a ' man in charge' was abused by sending instead a man who was not in charge of the stock, and had no connection with it or the shippers. Weaver was, for the purpose of getting a ride for nothing, pretending (with the connivance of the shippers) to be what he was not—a bona fide employé of the shippers, in charge of their stock. Under these circumstances he had no right to the transportation. He was therefore wrongfully on the train. In other words, he was a trespasser. And, irrespective of the release signed by him, the company is not liable."

We do not think the trial judge erred in refusing to direct a verdict for defendant on the ground that Weaver was a trespasser. The contract relied upon was between Altenburg & Van Buskirk as shippers, and the railroad company as carrier, and intended to be signed by both parties. It was signed by the carrier, and by its station agent, and purported to have been signed by the shippers, although Mr. Altenburg testified that he never signed it, and had never read it, and there was no evidence, so far as the record shows, who did sign the shippers' names. The contract between the shippers and the carrier was all set forth upon the face of the paper, appears to be complete, and contains no reference to anything upon the back thereof. There is no provision in this contract, as signed, requiring that the person accompanying the stock shall be a "bona fide employé" of the shippers. It gave them the right to select whomsoever they chose, and send

him in charge of the stock, in consideration of their indemnifying the carrier against liability for injuries received by the person so placed in charge. It was manifestly the shipper who assumed all of the risk of an improper selection, and not the carrier. *Heller* v. *Railway Co.*, 109 Mich. 53.

The provisions with reference to " bona fide employés " are all upon the back of the agreement, not included in the agreement signed by the shippers, either explicitly or by reference, and are, in form, directions or instructions to the carrier's agent. Although one of these clauses was apparently signed by John Weaver, an inspection of the original in the return to the writ shows that it was not contemplated that it should be signed by him. Evidently the only clauses which it was intended that Weaver should sign were the two clauses reading as follows:

" Parties actually in charge of and accompanying within-named stock are required to write their own names in ink here.   *   *   *

" I hereby sign my name as a means of identifying myself as original signer of this contract."

These instructions to the carrier's agent seem to be designed for the protection of the company by insuring that the person who received a pass should be the person actually in charge of and accompanying the stock. The words " bona fide employés," as used in the instructions to the agent, mean the same thing as the expression, "Parties actually in charge of and accompanying within-named stock." The word " employé " has a variety of meanings, according to the context, subject-matter, and circumstances in which it is used. According to Webster, an employé is "one who is employed." According to the text of the 11 Am. & Eng. Enc. Law (2d Ed.), p. 1:

" To employ means to engage in one's service; to use as an agent or substitute in transacting business; to commission and intrust with the management of one's affairs; when used passively, it sometimes has a reflexive meaning, signifying only to be engaged in. To select; to designate."

In *Reg.* v. *Reason*, 23 L. J. Rep. (N. S.) part 3, p. 11, it was held that if a person, while engaged in gratuitously assisting a postmaster, at his request, in sorting the letters, steal one of them, he is liable to the severer penalties imposed by the statute as a person employed under the post office.

In the case of *Reg.* v. *Foulkes*, L. R. 2 C. C. R. 150, the prisoner's father was clerk to a local board, and held other appointments. The prisoner lived with his father, and assisted him in his office and in the business of the board. In his father's absence, the prisoner acted for him at the meetings of the board, and when present he assisted him. The prisoner was not appointed or paid by the board, and there was no evidence that he received any salary from his father. The board having occasion to raise a loan on mortgage, the prisoner managed the business for his father, and at his father's office received the money from the mortgagees, and appropriated a part of it to his own use. Held, that there was evidence that the prisoner was a clerk or servant, or employed as a clerk or servant, and was guilty of embezzlement.

It was not necessary in this case that Weaver should have been employed before the occasion in question; nor was it necessary that there should have been any compensation in money provided for. It was sufficient if he was actually put in charge of the stock with the understanding that he should render such services as should become necessary in consideration of the transportation furnished to him. If this was substantially the transaction between Weaver and the shippers, then he was a bona fide employé in the sense in which those words are used on the back of the contract.

Defendant's counsel regarded this inquiry as foreclosed by the testimony of Altenburg, who was called as a witness by plaintiff, and testified that Weaver was not in his employ or the employ of Altenburg & Van Buskirk at any time during his lifetime; that Weaver came to him a perfect stranger, and told him he wanted to get a pass to Buffalo; that on learning he was the son of Dan Weaver,

a friend of Altenburg's, he gave him the pass simply as a favor to his father; that they had not been in the habit of sending a caretaker with their cattle, because it was unnecessary; that he told one of the defendant's agents at the depot to give Weaver a pass; that he expected that, if anything happened to the stock, Weaver would take hold and help, if called upon, but didn't think he would be called upon because of the light load. It appeared also from the testimony of Altenburg and others that Weaver put on two suits of clothes when he left home, and his overalls over them; that he got to the stockyards about 10 o'clock in the forenoon, and worked from then until 3 o'clock in the afternoon, at which time the loading of the stock was finished; that he told the conductor that he was in charge of the stock, and he signed the statement that he was in charge of the stock, and the agent authenticated it; that he had his overalls on when he was killed. Altenburg testified that Weaver was not asked to help load the stock; but he did help load it, and thereby plainly showed his understanding that he was to earn his pass by doing whatever needed to be done about the stock. Altenburg had been notified by defendant's attorney that the railroad company would look to Altenburg & Van Buskirk to indemnify them against any damages on account of the death of Weaver, and the jury were entitled to view his testimony in the light of his manifest interest, and to reject some parts of it and accept others. We think there was evidence from which the jury might have found that Weaver was actually placed in charge of the stock by Altenburg, with the understanding that he should do whatever was necessary to be done in caring for them; and the trial judge would not have been warranted in taking this question from the jury.

But, in any event, defendant's counsel contend: That the company is not liable because the release signed by plaintiff's intestate was a valid and binding contract, and absolved the company from liability. That, whatever the law may be in other States, it is the settled law in Michi-

gan that railway companies are not common carriers of live stock. They are not bound to perform the service of carrying live stock. Nor does the fact that they do in fact carry such stock under special contracts, such as the one in this case, make them common carriers. That if the railway company, in making the contract in question here, was not acting in the capacity of a common carrier, the whole argument against the validity of the release necessarily falls to the ground; for if it was contracting to do a service which it was not bound by law to do in any event, clearly it had the right to impose such conditions as it saw fit upon the performance of the service, and the agreement of the shippers to indemnify it against, and of Weaver to release it from, liability for injuries to the latter caused by the negligence of the company's employés, is entirely valid—citing *Michigan Southern, etc., R. Co.* v. *McDonough,* 21 Mich. 165, 193; *Lake Shore, etc., R. Co.* v. *Perkins,* 25 Mich. 329; *Heller* v. *Railway Co.,* 109 Mich. 53; *McKenzie* v. *Railroad Co.,* 137 Mich. 112; *Coup* v. *Railway Co.,* 56 Mich. 111, 115; *Mann* v. *Railroad Co.,* 135 Mich. 210; *Wilson* v. *Railroad Co.,* 129 Fed. 774, 783; *Baltimore, etc., R. Co.* v. *Voigt,* 176 U. S. 498, 514; *Russell* v. *Railway Co.,* 157 Ind. 305, 316 (55 L. R. A. 253).

Plaintiff's counsel does not claim, in support of the judgment in this case, that the defendant was a common carrier of live stock, but contends that, as to the plaintiff's intestate, defendant was a common carrier of passengers, and therefore, upon grounds of public policy, it could not lawfully stipulate for exemption from responsibility for its own negligence.

In our opinion, the contention of plaintiff's counsel must be sustained. This precise question was exhaustively considered and discussed by Mr. Justice Bradley in the case of *Railroad Co.* v. *Lockwood,* 17 Wall. (U. S.) 357. In an opinion of great force and clearness of reasoning, concurred in by the entire court, it was held that the plaintiff, riding upon a stock drover's pass, as in the pres-

ent case, was a passenger for hire, and the release of liability for damages on account of negligence of the carrier was invalid.   The same rule is adopted in Illinois (*Illinois Cent. R. Co.* v. *Beebe*, 174 Ill. 13 [43 L. R. A. 210]):

"It is said, however, that in Illinois a carrier may by contract limit its liability for all negligence except gross negligence.   This rule has been laid down in some cases in reference to the shipment and carriage of property, but does not apply when a carrier intends to limit its liability for personal injury to a passenger paying fare.   Where a passenger was traveling in the cars of a railroad company upon a free pass given him by the company, and received injuries to his person, it has been held that a contract exempting it from liability for any other species or degree of negligence than gross negligence was valid.   *Illinois Cent. R. Co.* v. *Read*, 37 Ill. 484; *Toledo, etc., R. Co.* v. *Beggs*, 85 Ill. 80.   But in the present case it cannot be said that the deceased intestate was riding upon a free pass.

"'A person who is traveling, with the consent of the railroad company, upon a freight train, in charge of stock or goods carried by the company for him, is a passenger. *Indianapolis, etc., R. Co.* v. *Beaver*, 41 Ind. 493; *Lawson* v. *Railway Co.*, 64 Wis. 447.   Even where such a person is traveling in charge of cattle on a drover's pass, he is a passenger for hire.   The consideration of his passage is the service he renders in taking care of the cattle, or the charge made against him or his employer for shipping the cattle. *Railroad Co.* v. *Lockwood*, 17 Wall. (U S.) 357; *Indianapolis, etc., R. Co.* v. *Horst*, 93 U. S. 291; *Cleveland, etc., R Co.* v. *Curran*, 19 Ohio St. 1; 3 Am. & Eng. Enc. Law. p. 16, and cases cited in notes; *Lake Shore, etc., R. Co.* v. *Brown*, 123 Ill. 162; *New York, etc., R. Co.* v. *Blumenthai*, 160 Ill 40.'"

Many authorities are cited in support of the doctrine in plaintiff's briefs, and we are satisfied that it has in its support the great weight of reason and authority.

The cases of *Baltimore, etc., R. Co.* v. *Voigt*, 176 U. S. 498, and *Russell* v. *Railway Co.*, 157 Ind. 305 (55 L. R. A. 253), upon which defendant's counsel strongly rely, are, in our opinion, fatal to his contention.   The case of *Baltimore, etc., R. Co.* v. *Voigt* distinctly recognizes and approves of the *Lockwood Case*, and distinguishes

the case under consideration from that case, and therefore from the case before us.   It was held that Voigt was not a passenger, while Lockwood was.   So in the case of *Russell* v. *Railway Co.* the court fully recognize the validity of the rule adopted in the *Lockwood Case* and approved in Indiana in numerous cases.   Among other cases the court quotes from its own decision in *Louisville, etc., R. Co.* v. *Faylor*, 126 Ind. 126, in which the plaintiff "was a passenger at the time he suffered the injury complained of, and was occupying a seat in a caboose attached to a freight train in which he was transporting a car load of cattle.   While the train on which he was being carried was ascending a steep grade, a number of the cars, including the caboose in which the plaintiff and others were seated, became detached from the engine and the forward part of the train," collided with a following engine, and plaintiff was severely injured.   The railroad company set up, among other things, "that at the time of the injury complained of the plaintiff was in charge of a car load of cattle, and was riding under a contract, in which it was stipulated that, in consideration of a free pass and other valuable considerations, the company was to be exempt from any liability for any injury which the plaintiff might sustain while in charge of the cattle."   The court held that:

"A stipulation that the carrier shall not be bound to the exercise of care and diligence is, in effect, an agreement to absolve him from one of the essential duties of his employment, and it would be subversive of the very object of the law to permit the carrier to exempt himself from liability by a stipulation in his contract with a passenger that the latter should take the risk of the negligence of the carrier or of his servants.   The law will not allow the carrier thus to abandon his obligation to the public, and hence all stipulations which amount to a denial or repudiation of duties which are of the very essence of his employment will be regarded as unreasonable, contrary to public policy, and therefore void."

But the principal case under consideration now distin-

guishes this case and the *Lockwood Case* and others, and holds that the Pullman car porter "did not occupy the position of an ordinary passenger upon appellee's train." The *Voigt Case* and the *Russell Case* sustain the rule contended for by plaintiff's counsel that Weaver was a passenger for hire, as to whom defendant occupied the position of a common carrier of passengers, but as to express messengers and Pullman car porters the rule is different.

We find no errors in the rulings of the trial judge, and the judgment is affirmed.

MCALVAY, GRANT, MONTGOMERY, and OSTRANDER, JJ., concurred.