BURT E. MILLER, ADMR. *vs.* MAINE CENTRAL RAILROAD COMPANY.

Aroostook.    Opinion July 6, 1926.

*In interstate shipments the rights of the caretaker are determined by the Interstate Commerce Act as amended by the Hepburn Act of 1906.*

*It is against public policy for a common carrier to exempt itself from liability for its negligence in case of a passenger for hire.*

*The transportation of caretakers with live stock and perishable shipments is a practice of long standing, and so-called caretaker's "free passes" are authorized in the Federal Act.*

*The Federal Supreme Court, however, has interpreted the words "free pass" in this connection to mean not free in the ordinary sense, but in fact involves transportation for hire under a contract implied in the contract of shipment.*

*The Federal Act prohibits all other passes, except "free passes" described by its terms and which are not free in the popular sense. Such a pass as a "gratuitous free pass" is not authorized by the Act.*

In the instant case the pass issued to the plaintiff's intestate was either prohibited by the Act or, if authorized, must be held to be a part of the contract of shipment.

The plaintiff's intestate was either receiving gratuitous carriage in violation of the Federal Act, in which case any conditions attached were invalid, and he was entitled to the same protection as a passenger for hire, or was being transported

as a passenger for hire under an implied contract for transportation arising out of the contract of shipment. In either case the liability of the defendant is established.

On report. An action to recover damages for the death of plaintiff's intestate, Roy Miller, who, while traveling as a caretaker in charge of four carloads of potatoes was instantly killed in a train wreck at Farmingdale, on the line of the defendant railroad on February 27, 1925. The potatoes were being transported from stations on the Bangor and Aroostook railroad to destinations outside of the State of Maine. The cause was submitted to the Law Court on an agreed statement of facts and a stipulation that if defendant liable, case to be remanded for assessment of damages by a jury. Case remanded in accordance with the stipulation.

The case fully appears in the opinion.

*William T. Spear and Powers & Mathews,* for plaintiff.

*Perkins & Weeks,* for defendant.

SITTING: WILSON, C. J., PHILBROOK, DUNN, MORRILL, STURGIS, BASSETT, JJ.

WILSON, C. J. An action to recover for personal injuries resulting in the death of the plaintiff's intestate. The case is reported to this court on an agreed statement of facts, the Law Court to pass on the question of liability, and in the event of the defendant being found liable, the case is to be remanded to the court below for an assessment of damages by a jury.

In February, 1925, certain shippers in Aroostook County on the line of the Bangor and Aroostook Railroad Co. loaded four cars with potatoes for interstate shipment over the line of the Bangor and Aroostook Railroad Co., and its connecting lines, of which the defendant was one.

Under the tariff schedules of the initial carrier, the shippers had the option of shipping such goods in "heater cars," so called, in which case the carrier assumed the risk of freezing, or at a lower rate in "lined" or "unlined" box cars, in which the shipper by express stipulation assumed all risk of injury from frost. In the latter case, however, in accordance with long established custom and usage, the shipper was permitted to install stoves suitable for the purpose in

such box cars and send with the shipment a caretaker to tend the stoves to protect the shipment from frost.

The shippers in the instant case chose the latter method. The plaintiff's intestate was jointly employed by the shippers to accompany the shipments in the capacity of caretaker, or "fireman," as he was termed in the bill of lading issued by the initial carrier. While the cars were being transported to their destination over the defendant's railroad, as the result of a wrecking of the train of which they were a part, due, it is admitted for the purposes of this case, to the defendant's negligence, the plaintiff's intestate was instantly killed.

There had been issued to the caretaker by the initial carrier a so-called "caretaker's pass," on which it was assumed he was being transported, and for which nothing was paid by him or the shippers,—unless his transportation was a part of the contract of shipment,—and in connection with which he had signed, as required by the tariff schedule of the initial carrier, a release of the initial and all connecting carriers from all liability whether due to their negligence or that of their employees, or otherwise.

The tariff schedules of the initial carrier, which had been duly filed with the Interstate Commerce Commission and published, expressly provide that the rates for such shipments cover only the commodities and "do not include the transportation of caretakers;" the transportation of caretakers being covered by a distinct tariff, under which the caretaker had the option of travelling on a "gratuitous free pass," in which case he shall release the carriers from all liability whether due to the carriers' negligence or otherwise, or of purchasing a ticket for transportation at the regular passenger rates and travelling as a passenger for hire.

The plaintiff contends that notwithstanding his intestate apparently exercised an option and accepted a caretaker's pass and signed such release, the Interstate Commerce Act as amended by the Hepburn Act does not permit the issuing by interstate carriers of gratuitous caretakers' passes; and notwithstanding the provisions of the tariffs of the initial carrier, he was being transported as a "passenger for hire," and the release executed by him was invalid as against public policy and of no effect.

The defendant, however, insists that in view of the express provisions of the tariffs of the initial carrier, the plaintiff's intestate having exercised his option and chosen to travel on a "gratuitous

free pass" and release the carrier from all liability, he was not a passenger for hire and the release is, therefore, binding. In any event, it further contends that the plaintiff is now estopped from claiming in behalf of his intestate the rights of a "rejected alternative," viz.: of purchasing a ticket at the regular passenger fare and traveling as a passenger for hire.

The issues raised are apparently new and of considerable importance. No decided case in either State or Federal jurisdictions has been called to our attention where the tariff schedules or the contract of shipment were the same as in the case at bar.

It is well settled law in this state, and the rule followed in the Federal Courts, that in case of a passenger for hire, it is against public policy for a common carrier to exempt itself by contract, or otherwise, from liability for its own negligence. In case of one traveling on a gratuitous pass, a carrier may make it a condition of the issuance and acceptance of such pass that it will not be liable even for its own negligence, though in the absence of such stipulation a person traveling on a gratuitous pass is entitled to the same care and protection from the carrier as the passenger for hire.

*Buckley* v. *Railroad Co.*, 113 Maine, 164; *Rogers* v. *Steamboat Co.*, 86 Maine, 261; *Quimby* v. *B. M. R. R. Co.*, 150 Mass., 365; *Griswold* v. *N. Y. & N. E. R. Co.*, 53 Conn., 371; *Railroad* v. *Lockwood*, 17 Wall., 357; *Grand Trunk Ry.* v. *Stevens*, 95 U. S., 655; *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S., 397; *Southern Pac. Co.* v. *Schuyler*, 227 U. S., 601; *Kansas City Southern Ry.* v. *Van Zant*, 260 U. S., 459.

The transportation of "drovers" with livestock shipments and "caretakers" with certain perishable freight without other compensation than that paid for the shipment of the commodity has been a practice of long standing, and the rights and liabilities of the parties have been established by a long line of decisions in both the State and Federal Courts from *Railroad Co.* v. *Lockwood*, supra, to *Norfolk Southern R. R. Co.* v. *Chatman*, 244 U. S., 276.

The history of the litigation involving the rights of caretakers traveling on passes or permits issued in connection with such shipments discloses a persistent effort on the part of carriers to devise some agreement or create some condition under which they might be relieved against their own negligence in case of injuries to such caretakers in the course of transportation.

Whenever such caretakers have been held to be traveling as passengers for hire, the courts in this country have generally held that any agreement or stipulation absolving the carrier from liability for its own negligence was invalid and no defense. *Railroad Co.* v. *Lockwood,* supra; *Norfolk Southern R. R. Co.* v. *Chatman,* supra; *Kirkendall* v. *Union Pac. R. Co.,* 200 Fed. R., 197; *Weaver* v. *Ann Arbor R. Co.,* 139 Mich., 590; *Sprigg* v. *Rutland R. Co.,* 77 Vt., 347; *Baker* v. *B. & M. R. R.,* 74 N. H., 100; *Ill. Cent. R. R. Co.* v. *Anderson,* 184 Ill., 294; *Pittsburg etc. R. R. Co.* v. *Brown,* 178 Ind., 11; *Buckley* v. *B. & A. R. Co.,* supra.

Thus far no court, which holds to the doctrine that carriers may not absolve themselves from liability to a passenger for hire for the results of their own negligence, has held such a stipulation in a caretaker's pass to be valid and binding.

The question of the rights of persons traveling on a so-called "caretaker's pass" first arose in *N. Y. C. R. R. Co.* v. *Lockwood,* 17 Wall., 357, in which a drover traveling with his livestock, in consideration of the carrying of his cattle for a lower rate, stipulated to assume all risk of injury to them and to himself resulting from the negligence of the carrier or otherwise.

The court held that a drover traveling on a pass such as was issued in that case was a passenger for hire, and a stipulation exempting the carrier from the result of its own negligence was not just and reasonable, and was contrary to public policy, and void.

Following this decision the Federal Courts in a long line of decisions, without exception, have held that passes issued to drovers or caretakers of livestock were not gratuitous passes, but were issued as a part of the contract of shipment, and such caretakers were passengers for hire. See cases above cited.

The same rule has been applied by the State courts to the caretakers of milk, *Baker* v. *B. & M. R. R.,* 74 N. H., 100, and by this court to the caretakers of potatoes in the Buckley case above cited.

An attempt was made in the Buckley case by counsel to distinguish it from the "drover's pass" cases upon the ground that the shipper in the Buckley case had an election as to the method of shipment; that the freight rate was the same, if shipped in a "box car," whether a caretaker went along or not, or whatever the season was, in which, the shipment took place; and that the caretaker in the case of a shipment of potatoes rendered no service to the carrier, nor did his presence relieve the carrier of any responsibility.

But the court held that in principle the cases could not be distinguished, and said: "We do not think that the fact that the shipper had an election by which method the potatoes should be shipped is important in this case. Nor is the fact that the defendant's freight charge was the same by whatever method, or at what season, potatoes were transported; nor the fact, if it be a fact, that the plaintiff rendered no service to the defendant, and that his presence with the potatoes was of no benefit to the company."

"Out of the election of the shipper arose, in accordance with the defendant's usage in such cases, an implied contract that the shipper was to ship his potatoes in a lined box car, and that some person was to accompany them as caretaker to keep them from freezing. It was all one contract and under it the caretaker had a right to carriage with the potatoes. The sum paid for the transportation of the potatoes included his carriage. His carriage was therefore not gratuitous."

Such has been the almost unanimous conclusion of the courts under all the forms of caretaker passes and agreements yet submitted for judicial construction and determination.

The defendant asks the court in the case at bar to distinguish it from the cases previously decided by reason of the language of its tariffs both as to the shipments and caretakers, and strenuously urges that the option given to the caretaker, and the express provision that the tariff for the shipment in question only covers the commodity shipped, and excludes the transporation of the caretaker, clearly distinguished it from the prior cases.

If it were solely a state question, the defendant's contention might have some weight, though the plaintiff insists, and not without force, that a carrier cannot by mere dictum in its tariffs change facts, or by calling a "free pass" a "gratuitous free pass" change its character or its legal status; that the tariff provisions of the initial carrier are mere subterfuges to escape liability for its own negligence; and that the alleged option for the caretaker is an option in theory only, by its very terms overstepping the mark, and disclosing that it was not conceived in good faith, in requiring a caretaker if he wishes to travel as a passenger for hire to pay full passenger rates when riding in a box car; while on his return trip he may have the same protection and travel, at least, second class upon the payment of one cent per mile.

However, the issue here is mainly, if not entirely, a Federal question, and must be determined by the Federal Statutes and the rules laid down in such cases by the Federal Courts. Congress has taken over under the Interstate Commerce Act and the several amendments thereto the entire matter of regulating common carriers engaged in interstate commerce, including the issuing of free passes and free transportation to caretakers. The rights of the parties in the case at bar, therefore, must be determined by the Interstate Commerce Act as amended, and interpreted by the Federal Supreme Court, and by the decisions of that court. *Adams Express Co.* v. *Croninger*, 226 U. S., 491, 505; *Kirkendall* v. *Union Pac. R. Co.*, 200 Fed. R., 197; *Kansas City So. Ry.* v. *Van Zant*, 260 U. S., 459.

There is no force, we think, in the defendant's contention that the case at bar is analogous to the cases involving the limitation of damages to the valuation placed on goods shipped, in order to obtain favorable freight rates. The value of the goods transported and the extent of the liability in case of loss enters into the determination of what are reasonable rates; and a representation as to value of shipment to obtain lower rates ought in all fairness to estop the shipper, who has obtained the favorable rates, from setting up a greater value to his damaged goods than that upon which he obtained his advantage. The question in such cases is not one of exemption from all liability for its own negligence, but of a reasonable limitation upon its liability based upon the shipper's own representations as to material facts. *Adams Express Co.* v. *Croninger*, supra; *Kansas So. Ry.* v. *Carl*, 227 U. S., 639, 651.

Nor do we think the fact that the tariff schedules were duly filed with the Interstate Commerce Commission and are presumed to be binding as to rates upon both parties, has any effect upon the rights of these parties.

As the court said in *Wilcox* v. *Erie R. Co.*, 147 N. Y. S., 360, 366; "The defendant claims that the case comes within the Interstate Commerce Law, which is exclusive; that it had duly filed with the Interstate Commerce Commission its schedules, rates, tariffs, and classification; as among said documents appeared the form of the contract and release under consideration, thereby said contract and release became authorized as legal by act of Congress. If the Congress of the United States by direct enactment had so legislated, of course, there could be no question as to its power. It has been

given by the Constitution complete jurisdiction of interstate commerce, if and when it chooses to exercise it.  But it is a startling proposition that, without a word on the subject in any act of Congress, the settled policy of the United States, announced in innumerable cases by the Supreme Court, has been completely overturned by the mere filing of a form of contract and release with an administrative board.".

The court in that case then goes on to summarize the policy of the United States as laid down in the decisions of the Supreme Court: that it was against public policy to permit a railroad company to stipulate relief from the results of its own negligence; and that in particular a drover traveling on a pass for the purpose of taking care of his stock was a passenger for hire, a rule which must also apply to all other caretakers traveling under like conditions, as was held by this court in the Buckley case above cited.

The case at bar, however, hinges on the interpretation to be put upon the Interstate Commerce Act as amended by the Hepburn Act of 1906.  It provides in Section 1, that, "No common carrier subject to the provisions of this Act shall, after January 1st, 1907, directly or indirectly give any interstate free ticket, free pass, or free transportation for passengers, except" to certain expressly enumerated employees, officers, and persons, and "to necessary caretakers of livestock, poultry, milk and fruit." ·

Even if the tariffs of the initial carrier in the case at bar had the express sanction of the Interstate Commerce Commission,· the Federal Courts would undoubtedly hold them of no validity if they authorized the issuing of free passes contrary to the provisions of the Act.  At first blush, it might seem that the language of the Act, as amended, expressly authorized the issuing of gratuitous passes to caretakers, such as the plaintiff's intestate, assuming that potatoes come under the classification of fruit; but the Federal Supreme Court has placed a construction upon this provision and the meaning of the words "free pass" or "free transporation" as applied to caretakers, by which all interstate common carriers, and state courts in determining the rights of parties thereunder, are bound.

In *Norfolk Southern R. R. Co.* v. *Chatman*, supra, in which it was urged that the caretaker was traveling on a gratuitous pass issued under Section 1 of the Act, and so was not a passenger for hire, the court said:  "Notwithstanding the fact, as we have seen, that such

transportation has been declared by a long line of decisions not to be 'free' in the popular sense, but to be transportation for hire, with all of the legal incidents of paid transportation, the carriers of the country have continued to issue it and to designate it as 'free'."

"With this legal and commercial history before us we must conclude that the designation 'free pass,' as applied to transportation issued or given by railroad companies to shippers and caretakers of stock, had acquired a definite and well known meaning, sanctioned by the decisions of this court and widely by the decisions of the courts of the various States, long prior to the enactment of June 29, 1906, and that, therefore, Congress must be presumed to have used the designation 'free pass' in the sense given to it by this judicial determination, when, in Section 1 of that act, by specific exception, it permitted the continuance of the then long established custom of issuing free transportation or passes to shippers or caretakers of live stock."

"It results that the settled rule of policy established by the Lockwood case, and the decisions following it, must be considered unmodified by this Act."

It is true that the Chatman case was a so-called "drover's pass" case, but as this court said in the Buckley case, there is no difference in principle between such cases and a caretaker of potatoes. The exception in the Interstate Commerce Act permitting the issuing of free transportation to necessary caretakers makes no distinction between caretakers of livestock, and caretakers of milk or fruit. It authorizes the issuance of a "free pass" to either, but, under the ruling in the Chatman case, not "free" in the popular sense of the word, but free in name only, and as a part of the consideration of the contract of shipment.

Such a thing as a "gratuitous free pass," described in the tariff of the initial carrier, is either prohibited by the Act, or if one, so designated, be authorized and sanctioned by the Interstate Commerce Commission, it must be held to mean no more than "free pass" was construed to mean in the Chatman case.

If the pass held by the plaintiff's intestate was free only in the sense defined in the Chatman case, he was clearly a passenger for hire, and the release invalid; or if gratuitous in the ordinary sense of the term, it was in violation of the Act, and any contract of release based thereon was without consideration and of no effect. Williston on Contracts, Vol. III., Secs. 1762, 1764.

The plaintiff's intestate, therefore, was either receiving gratuitous carriage without valid conditions attached, and under the law of this State was entitled to the same care and protection as a passenger for hire, *Southern Pac. Co.* v. *Schuyler*, 227 U. S., 601; *Rogers* v. *Steamboat Co.*, supra; or was being carried as a passenger for hire under an implied contract for transportation arising out of the contract of shipment as in the Buckley case. In either case the liability of the defendant is established.

> *Case remanded to the court below for assessment of damages by a jury in accordance with the stipulation of the parties.*