This section relates solely to the rates, fares, and charges for transportation. It does not attempt to validate contracts which were void as against the public policy of the United States at the time that the act was passed. As I read the act, it did not change the public policy of the United States, which refuses to enforce such contracts. The common carrier, by filing a tariff with the Commission created by the act, could not, as I view it, change the whole public policy of the United States, and validate contracts which that public policy had declared void and unenforceable. The charge to be collected by the carrier was fixed, and from that charge the carrier could not deviate. For that charge the passenger or shipper was entitled to the services rendered; but before the tariff was fixed a contract exempting the carrier from liability for its own or its employé's negligence was unlawful, and it remained unlawful until Congress should by some express provision change the law of the United States and render such a contract enforceable.

My conclusion, therefore, is that Congress has taken within its exclusive control all interstate commerce, and that thereby the general law of the United States becomes applicable to interstate shipments; that by the law of the United States any contract exempting the carrier from liability for its own negligence, or the negligence of its servants, is unlawful and void; and that Congress has not by any provision validated such a contract. Therefore it was no defense to the action that the shipper had signed a contract relieving the carrier from liability for its own negligence.

It follows that the judgment was right, and should be affirmed.

McLAUGHLIN, J., concurs.

---

(162 App. Div. 6)

FERRARI v. NEW YORK CENT. & H. R. R. CO.   (No. 5629.)

(Supreme Court, Appellate Division, First Department.   May 1, 1914.)

1. CARRIERS (§ 134*) — ACTION FOR INJURY TO GOODS — SUFFICIENCY OF EVIDENCE—NEGLIGENCE.
   In an action for damage by fire to a circus outfit, which defendant was transporting, a verdict that the fire originated through defendant's negligence held against the weight of the evidence.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 588–592, 607; Dec. Dig. § 134.*]

2. CARRIERS (§ 137*) — INJURIES FROM FIRE — SPARKS FROM ENGINE — NEGLIGENCE.
   An instruction that if a fire resulted from sparks from an engine defendant was liable was error, in that it entirely withdrew the question whether the sparks escaped by reason of defendant's negligence.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 594, 595; Dec. Dig. § 137.*]

3. CARRIERS (§ 150*)—INTERSTATE COMMERCE—LIMITATION OF LIABILITY.
   A clause in a special contract for interstate transportation, relieving the carrier from liability for its own negligence, is void under the express provisions of Interstate Commerce Act Feb. 4, 1887, c. 104, § 20, 24 Stat.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

386 (U. S. Comp. St. 1901, p. 3169), as amended by Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 (U. S. Comp. St. Supp. 1911, p. 1307), and against public policy, if the carrier is acting as a common carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 654–659; Dec. Dig. § 150.*]

4. CARRIERS (§ 150*)—ACTS OUTSIDE CARRIER'S DUTIES—TRANSPORTATION OF CIRCUS OUTFIT—CONTRACT—EXEMPTION FROM NEGLIGENCE.

Defendant, without the issuance of a receipt or bill of lading, entered into a special contract for the interstate transportation of plaintiff's circus outfit in cars to be furnished by plaintiff, providing that it should not be considered a carrier of goods and that its engineer and trainmen should, as to the transportation, be the servants of plaintiff, and exempting it from liability for damage from any cause, and releasing it from all liability therefor. Defendant filed with the Interstate Commerce Commission a schedule of rates for the transportation of such outfits under the ordinary contract of carriage, which fixed a charge nearly double that made by the special contract, and as allowed by a rule of the Commission, also filed a copy of the special contract. *Held,* that defendant was not acting as a common carrier, and that, even though damage to circus wagons from fire resulted from its negligence, the contract exemption from liability was valid.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 654–659; Dec. Dig. § 150.*]

Laughlin, J., dissenting in part.

Appeal from Trial Term, New York County.

Action by Emma Ferrari against the New York Central & Hudson River Railroad Company. Judgment entered on verdict for plaintiff. Motion for new trial denied, and defendant appeals. Reversed, and complaint dismissed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

William Mann, of New York City, for appellant.

Charles Goldzier, of New York City, for respondent.

McLAUGHLIN, J. On the 5th of June, 1909, the plaintiff entered into a written agreement with the defendant and two other railroad companies for the transportation of a circus outfit, of which she was the owner, from New York City to Burlington, Vt. The outfit consisted of "show material, show animals, apparatus and paraphernalia, and persons in charge thereof, employés and performers, and their respective personal baggage, in cars to be furnished, loaded, and unloaded by and at the expense" of the plaintiff. The total equipment, however, was not to exceed eleven flat cars, two box cars, and one passenger coach. On the 28th of June following the equipment was presented to the defendant for transportation. It consisted of nine flat cars, several box cars, and a passenger coach; one or two of the box cars and the coach being furnished by the defendant, but solely for plaintiff's benefit. After the train had been made up, it proceeded over the defendant's line from New York City to Dover Plains, N. Y., where a fire was discovered in one of the circus wagons, which was loaded on a flat car. There is a conflict in the evidence as to which wagon first caught fire—plaintiff's witnesses testifying that it

was what was termed the organ wagon, and in which no one was at the time; defendant's witnesses testifying it was a wagon used for a dressing room, and in which one of the performers connected with the circus was then living. Before the fire could be extinguished, three of the wagons were damaged, two of them—the one used as a dressing room and the organ wagon—being practically destroyed. This action was brought to recover the damages sustained, upon the ground that the fire was caused by defendant's negligence in permitting sparks to escape from the engine. Plaintiff had a verdict, and from the judgment entered thereon, and an order denying a motion for a new trial, defendant appeals.

[1] There was a sharp conflict between the parties as to the origin of the fire. The evidence offered on the part of the plaintiff was to the effect that the same was started by sparks from the engine—one of the witnesses stating that the engine was emitting numerous sparks, some of them as large as marbles, which fell on the wagon which took fire, and on the car to the rear of it; and others that large cinders fell as far back as the rear end of the train. On the part of the defendant it appeared that the fire started in the wagon in which one of the performers was living, and that it was caused by an oil or gasoline stove. Several employés of the circus troop who were on the train at the time of the fire were called by defendant as witnesses. Artis, one of them, testified that he was riding in one of the box cars at the time, and when he first discovered the fire it was confined to the car in which Mme. Marcelle was living, and it was then on the inside of that wagon, and that he saw a lighted oil or gasoline stove, with other blazing material, thrown out of this wagon after the train was stopped. His testimony was corroborated by three other circus employés.

A very significant fact, however, is that the wagon used for a dressing room (which was nearer the engine than the organ wagon) was practically destroyed, while the third wagon from it (which was immediately back of the organ wagon) was only slightly scorched. If the fire had started in the organ wagon, it would have been communicated to the one in the rear of it sooner than to the one in front, not only because of the motion of the train, but because the wind was blowing in that direction. This fact, together with the other evidence showing the condition of the engine, fairly shows that the fire started in the wagon used for a dressing room, and was not caused, as claimed by plaintiff by sparks from the engine. Thus plaintiff's witness Brown testified that he was familiar with the spark arrester used by defendant in 1909; that it was the standard type, made of quarter-inch mesh with one-eighth of an inch wire, and when in good condition particles of a larger size than one-quarter of an inch could not escape. Defendant's witness Triber testified that he was a boiler inspector; that he examined the spark arrester on the engine attached to the train in question shortly after the fire; that it was of the standard kind, had the usual quarter-inch mesh, and was in good condition. His testimony was not contradicted, and when it is taken in connection with the testimony of defendant's other witnesses as to the origin of the fire, I am of the opinion that the verdict that the

fire was caused by the negligence of the defendant is against the weight of evidence.

[2] The court charged the jury that:

"If the fire occurred by reason of the sparks being emitted from the engine, then the defendant is liable, and your verdict ought to be for the plaintiff."

I think this was error. It withdrew entirely from the jury the question whether the sparks, assuming that they did escape from the engine, did so by reason of defendant's negligence.

[3, 4] But irrespective of the question whether the verdict is against the weight of evidence, or the court erred in respect to the charge as made, I prefer to place the decision upon another ground, because, if my conclusion be correct, then the judgment and order should not only be reversed, but the complaint dismissed. The contract by which the outfit was being moved provided that defendant was not to be considered a carrier of plaintiff's goods, but simply as furnishing the motive power, men, etc., necessary for the transportation; that the conductors, engineers, trainmen, and other employés furnished by defendant were to be deemed, so far as the transportation was concerned, the servants of the plaintiff; and that defendant "shall not be liable to the said party of the second part [plaintiff], nor to any person or persons, for any injury or damage which may happen to said persons, cars, or property to be or which shall be transported hereunder, which may be caused by defect in said railroad or tracks or unsuitableness thereof for such transportation, or by the negligence of said conductors, engineers, trainmen, or other servants, or any or either of them, or arising from any cause whatsoever"; and that plaintiff "doth hereby release and discharge the railroad company from all liability for loss or damage to any of its property while upon the railroad and premises of the railroad company, and hereby expressly agrees and binds itself to indemnify, save harmless, and protect the said railroad company from and against any and all claims, damages, costs, and demands in any way arising in or about or incident to the use and service, or either thereof, provided for by this agreement, whether in any case occasioned by the negligence of the railroad company, its agents, or servants, or otherwise."

If the contract were valid, defendant was not liable, even though it be assumed that the loss were occasioned by its negligence. It related to interstate commerce, and if defendant, in doing what it did, were acting as a common carrier, then undoubtedly the clause quoted, relieving it from its own negligence, would be void under Interstate Commerce Act, § 20, and against public policy. S. F. R. R. Co. v. Grant Bros. Con. Co., 228 U. S. 177, 33 Sup. Ct. 474, 57 L. Ed. 787; K. C. S. Railroad Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. Ed. 683; Adams Ex. Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; Willcox v. Erie R. R. Co., 147 N. Y. Supp. 360, decided herewith. If, however, the services to be performed by the railroad company were not those of a common carrier, then the clause may be enforced, since it neither violates the statute, nor is it against public policy.

In S. F. R. R. Co. v. Grant Bros. Con. Co., supra, a railroad company made a contract for the repair or extension of its line, and in it was a provision that the contractor, in consideration of reduced rates of transportation of supplies and employés, assumed all risk of damage of any kind, even if occasioned by the company's negligence. It was held that the contract was valid and should be enforced; that in dealing with transportation of supplies and employés of the contractor the railroad company did not act as a common carrier. Mr. Justice Hughes, who delivered the unanimous opinion of the court, after referring to the rule prohibiting a common carrier exempting itself from liability for its own negligence, said:

"Manifestly this rule has no application when a railroad company is acting outside the performance of its duty as a common carrier. In such case it is dealing with matters involving ordinary considerations of contractual relation, those who choose to enter into engagements with it are not at a disadvantage, and its stipulations even against liability for its own neglect are not repugnant to the requirements of its public service. The rule extends no further than the reason for it. It is apparent that there may be special engagements which are not embraced within its duty as a common carrier, although their performance may incidentally involve the actual transportation of persons and things, whose carriage in other circumstances might be within its public obligation. * * * It is clear that in dealing with transportation of this character over its own road, in connection with construction or improvement, a railroad company is not acting in the performance of its duty as a common carrier, and the arrangement for free or reduced-rate carriage for the necessary materials and men used in the work, when it is a part of the contract, entered into in good faith and not as a subterfuge, is not obnoxious to the provisions of law prohibiting departures from the published tariffs, for the reason that such an agreement lies outside the policy of these provisions. * * * The parties, then, were free to make their own bargain as to this transportation and the liability which should attach to it. There is no rule of public policy which denies effect to their expressed intention, but, on the contrary, as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made."

As I read the contract in the case before us, it was not for the transportation of goods or persons. The defendant merely agreed to furnish motive power, equipment, etc., necessary for the transportation of plaintiff's property and servants in her special train, composed almost entirely of her own cars. At no time was the property out of her control or that of her own employés. It was expressly agreed that the engineer, firemen, and trainmen furnished by defendant were to be considered, during the transportation, plaintiff's servants. No receipt or bill of lading was issued by defendant. No schedule of rates for such service had been filed with the Interstate Commerce Commission; on the contrary, the Interstate Commerce Commission had promulgated a rule which read:

"Rule 63. Transportation of Circus Outfits. This rule was issued March 18, 1907. The act to regulate commerce, as amended June 29, 1906, applies to the transportation of circuses and other show outfits. But the Commission recognizes the peculiar nature of this traffic and the difficulty of establishing rates thereon in advance of shipper's request describing the character and the volume of the traffic offered, and has therefore entered a general order authorizing carriers to establish rates on circuses and other show outfits by tariff to become effective one day after filing thereof with the Commission, and relieving them from the duty of posting such tariffs in their stations.

Such tariff may consist of a proper title page reading, 'As per copy of contract attached,' and to it may be attached a copy of the contract under which the circus is moved. As far as practicable, general rules or regulations governing the fixing of rates should be regularly published and filed."

In pursuance of this rule, defendant filed, immediately after the contract was entered into, a copy of it with the Interstate Commerce Commission. It also filed schedules of rates which were in effect at the time the contract was entered into for the transportation of circus outfits under the ordinary contract of carriage. The plaintiff was bound to take notice of this fact, and she could have shipped her property in that way, in which case the defendant would have been liable as a common carrier. The rates, however, for such shipment, were about double what plaintiff was charged, and she accordingly preferred to make the special agreement. The defendant, as a common carrier, was not obligated to transport the outfit in a special train, and when plaintiff induced it to do so she thereby relieved it as a common carrier.

The question does not seem to have been heretofore considered in this state, but the conclusion reached is supported by decisions in other jurisdictions. Clough v. C. T. & W. Ry. Co., 155 Fed. 81, 85 C. C. A. 1, 11 L. R. A. (N. S.) 446; Wilson v. Atlantic R. R Co. (C. C.) 129 Fed. 774; Chicago R. R. Co. v. Wallace, 66 Fed. 506, 14 C. C. A. 257, 30 L. R. A. 161; Robertson v. O. C. R. R Co., 156 Mass. 525, 31 N. E. 650, 32 Am. St. Rep. 482; Coup v. Wabash, etc., Ry. Co., 56 Mich. 111, 22 N. W. 215, 56 Am. Rep. 374. The Clough Case is directly in point. There, a circus company, owning its own cars, contracted with a railroad company for the hire of motive power and the use of tracks and trainmen, to be considered as the circus company's servants, for the transportation of the train from one place to another; the contract exempting the railroad company from liability for the injuries to any person or persons using the train for whatsoever cause. It was held that, the railroad company being under no legal duty to move the circus company in the manner specified, the contract was not contrary to public policy. Judge Lurton, who delivered the opinion of the court, said:

"If the contract under which the Wallace circus was being transported over the railway of the defendant was a valid contract, the relation of the railway company to the circus company was not that of a common carrier at all. That the railway company was under no common-law obligation to move the circus company over its line in the manner it was being transported at the time of the injury to the plaintiff in error must be conceded. If the railway company was under no statutory or common-law obligation to render the special service it was called upon to render, there were no reasons of public policy which forbade the rendition of such service upon such terms as the parties might stipulate. The right to make special stipulation under such conditions has been recognized and applied in a number of cases substantially like the case at bar, when circus trains were hauled under special agreements relieving the company from carrier's liability."

The plaintiff entered into the contract with the defendant with her eyes open. She did so for the purpose of personal gain. In order to get the reduced rate, she specifically agreed to exempt defendant from liability on account of its negligence, and I know of no reason why such agreement should not be enforced.

I am of the opinion, therefore, that, irrespective of the errors to which reference has been made, the judgment and order appealed from should be reversed, with costs, and the complaint dismissed, with costs.

INGRAHAM, P. J., and CLARKE and SCOTT, JJ., concur. LAUGHLIN, J., concurs on last ground.

---

(162 App. Div. 81)

## EQUITABLE LIFE ASSUR. SOCIETY OF UNITED STATES v. UNION PAC. R. CO. (No. 5720.)

(Supreme Court, Appellate Division, First Department. May 1, 1914.)

1. CORPORATIONS (§ 156*)—STOCKHOLDERS—PREFERRED STOCKHOLDERS.

As a rule the rights of preferred stockholders depend upon the interpretation of the particular constating instruments, such as the governing statute, the by-laws, a vote of shareholders, resolution of the directors, etc.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 581–583, 593–603; Dec. Dig. § 156.*]

2. CORPORATIONS (§ 156*)—RIGHTS OF STOCKHOLDERS—PREFERRED STOCKHOLDERS—STOCK DIVIDENDS.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 581–583, 593–603; Dec. Dig. § 156.*]

3. CORPORATIONS (§ 174*)—STOCKHOLDERS—RELATION WITH CORPORATION.

The relation of the several classes of stockholders to each other and to the corporation is purely contractual unless controlled by statute.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 649–652; Dec. Dig. § 174.*]

Appeal from Special Term, New York County.