to the 1st of September, 1910, and hence the obligation to account and pay over was incurred, and until that duty is duly performed the appellant is liable under its bond. Being a contract liability, it could not have been affected by subsequent legislation, for such legislation would have been violative of article 1, § 10, subd. 1, of the Constitution of the United States; but no such legislation was attempted, for, as pointed out, existing liabilities were expressly preserved. We have considered all the matters urged by the appellant upon this appeal and find no reversible error in the record.

The judgment appealed from should be affirmed, with costs to the respondent. All concur.

---

(162 App. Div. 94)

### WILLCOX v. ERIE. R. CO.   (No. 5621.)

(Supreme Court, Appellate Division, First Department.   May 1, 1914.)

1. CARRIERS (§ 307*)—CARRIAGE OF PASSENGERS—DROVER'S PASSES.
    Under the laws of New York, a person riding upon a drover's pass is a gratuitous passenger, and a release from liability for injuries caused by the carrier's negligence is valid.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*]

2. CARRIERS (§ 307*)—CARRIAGE OF PASSENGERS—DROVER'S PASSES.
    Under the laws of Illinois and Ohio, one riding on a drover's pass is a passenger for hire, and a release from liability for injuries caused by the carrier's negligence is invalid.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*]

3. CARRIERS (§ 234*) — CARRIAGE OF PASSENGERS — CONTRACTS — WHAT LAW GOVERNS.
    A shipper of cattle from Illinois to New York, who received a drover's pass to enable him to care for the animals, was required to sign a release for any injuries which might be caused by the carrier's negligence. He suffered injury in Ohio. *Held*, that the laws of either Illinois or Ohio, under which the release was invalid, not those of New York, govern.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 965, 1263, 1538; Dec. Dig. § 234.*]

4. CARRIERS (§ 307*)—INTERSTATE COMMERCE.
    Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, 34 Stat. 584, and Act June 18, 1910, c. 309, 36 Stat. 544 (U. S. Comp. St. Supp. 1911, p. 1284), provides in section 1 that no common carrier shall give any interstate pass or free transportation except to necessary caretakers of live stock, employés, etc. Section 6 requires a filing of tariffs making reasonable classification of property with the Interstate Commerce Commission, and prohibits any carrier from demanding or receiving a different compensation for the transportation of passengers or property; while section 20 declares that every railroad receiving property for transportation from one state to another shall be liable for any loss, damage, or injury. In the tariffs filed by an interstate carrier there was a provision releasing the carrier from liability for any injury, though caused by its own negligence, to those riding on a drover's pass to care for live stock, and the same schedule required the stock to be cared for by the shipper. *Held* that, in view of the previously declared public policy of the federal courts against permitting a carrier to free himself from liability for negligence

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

by contract, a shipper, riding on a drover's pass issued in accordance with the tariffs filed with the Commission, may recover for injuries caused by the carrier's negligence, though he had signed the release, particularly where, under the law both of the place of the shipment and of the injury. the shipper was a passenger for hire, and the release was invalid.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*]

Appeal from Trial Term, New York County.

Action by Smith G. Willcox against the Erie Railroad Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Stetson, Jennings & Russell, of New York City (William C. Cannon, of New York City, of counsel), for appellant.

John M. Harrington, of New York City (John S. Wise, Jr., of New York City, on the brief), for respondent.

CLARKE, J. Plaintiff, who is a resident of Pine Island, N. Y., owning and running a dairy there, was at Chicago and had 23 head of cattle which he desired to ship to his home. At Chicago, under date of June 1, 1911, he entered into a written agreement, designated as the "uniform live stock contract," with the Erie Railroad Company, by its duly accredited agent, to transport said cattle, of the weight stated, upon a described car—

"for transportation from the U. S. Yards, Chicago, Ill., to destination, if on the said carrier's line of railroad, otherwise to the place where said live stock is to be received by the connecting carriers for transportation to or towards destination, and that the same has been received by said carrier for itself and on behalf of the connecting carriers, for transportation, subject to the official tariffs, classifications, and rules of the said company, and upon the following terms and conditions which are admitted and accepted by the said shipper as just and reasonable, viz.:

"That said shipper, or the consignee, is to pay freight thereon to the said carrier at the rate of 28 per 100 lbs., which is the lower published tariff rate, based upon the express condition that the carrier assumes liability on the said live stock to the extent only of the following agreed valuation, upon which valuation is based the rate charged for the transportation of the said animals, and beyond which valuation neither the said carrier nor any connecting carrier shall be liable in any event, whether the loss or damage occur through the negligence of the said carrier or connecting carriers, or their employés, or otherwise: * * * If cattle or cows—not exceeding $75 each. * * *

"And in no event shall the carrier's liability exceed $1,200 upon any car load. * * *

"That the said shipper is at his own sole risk and expense to load and take care of, and to feed and water, said stock whilst being transported, whether delayed in transit or otherwise, and to unload the same; and neither said carrier nor any connecting carrier is to be under any liability or duty with reference thereto, except in the actual transportation of the same. * * *

"And it is further agreed by said shipper that in consideration of the premises and of the carriage of a person or persons in charge of said stock upon a freight train of carrier or its connecting carriers without charge other than the sum paid or to be paid for the transportation of the Live Stock in his or their charge, that the said shipper shall and will indemnify and save harmless said carrier and every connecting carrier from all claims, liabilities, and demands of every kind, nature, and description, by reason of personal injury

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sustained by said person or persons so in charge of said stock, whether the same be caused by the negligence of said carrier or any connecting carrier, or any of its or their employés, or otherwise.

"And S. G. Willcox does hereby acknowledge that he had the option of shipping the above-described live stock at a higher rate of freight according to the official tariffs, classifications, and rules of the said carrier and connecting carriers, and thereby receiving the security of the liability of the said carrier and connecting railroad and transportation companies as common carriers of the said live stock, upon their respective roads and lines, but have voluntarily decided to ship the same under this contract at the reduced rate of freight above first mentioned."

Upon the back thereof was the following:

### "Release for Man or Men in Charge.

"In consideration of the carriage of the undersigned upon a freight train of the carrier or carriers named in the within contract without charge, other than the sum paid or to be paid for the carriage upon said freight train of the live stock mentioned in said contract, of which live stock I am in charge, the undersigned do hereby voluntarily assume all risk or accident of damage to my person or property, and do hereby release and discharge the said carrier or carriers from every and all claims, liabilities, and demands of every kind, nature, and description, for or on account of any personal injury or damage of any kind sustained by the undersigned so in charge of said stock, whether the same be caused by the negligence of the said carrier or carriers, or any of its or their employés, or otherwise.

"[Signed]　Smith G. Willcox.　[Signature of Man in Charge.]
"J. Markey, Witness."

Plaintiff having executed said papers, the cattle were shipped thereunder upon a freight train of the defendant, and plaintiff accompanied said cattle thereon to care for, feed, water, and unload them. The train proceeded through Illinois, and as far as Kent, Ohio. There it consisted of two cabooses, two engines, and about fifty loaded freight cars. The train broke in two, a drawhead having pulled out of one of the cars. This affected the automatic application of the air brakes on the rear section, causing a sudden stop. The plaintiff was thrown against the desk in the corner of the caboose, another man was piled up on top of him, and he suffered the injuries complained of. Certain decisions of the courts of Illinois and Ohio were received in evidence.

At the close of the plaintiff's case, defendant moved to dismiss. The motion was denied, and exception taken. The defendant thereupon offered certain rates, schedules, and classifications filed with the Interstate Commerce Commission. It was conceded that this railroad company had duly filed and complied with whatever the Interstate Commerce Act makes necessary in reference to the conduct of its business, and that its rates, schedules, and classifications and whatever the statute requires have been duly filed in the several states through which it operates, New York, Illinois, and Ohio.

From the matters so offered appear the following:

### "Rules and Specifications.

"Unless otherwise provided when property is transported subject to the provisions of the Official Classification, the acceptance and use are required respectively of the * * * 'Uniform Live Stock Contract,' * * * 'Contract with Man or Men in Charge of Live Stock' (for use when payment of fare is not required). * * *

"18. Where the classification provides that man or men in charge of property shall pay full fare, the fare charged will be first (not second) class passenger fare.  *  *  *"

There was inserted the "Uniform Live Stock Contract" and the form of the "contract with man or men in charge of live stock (for use when payment of fare is not required)," copies of which were attached to the complaint and which the plaintiff signed.

"Classification.

"7. Live Stock.—*  *  *

"8. Domestic Animals.—Car loads, subject to rates and regulations of individual carriers; also subject to the Uniform Live Stock Contract and the following regulations:  *  *  *

"Live stock in car loads will be charged at the following minimum car load weights, subject to the actual weight if greater than the minimum car load weight:  *  *  *  Cattle per car, 20,000 lbs.  *  *  *

"Live stock will be taken at the reduced rates fixed in the tariff only when a Uniform Live Stock Contract is executed by the station agent and the consignor, and when the release on the back of said contract is executed by man or men who are to accompany said live stock. If consignor refuses to execute a Uniform Live Stock Contract, the live stock will be charged ten (10) per cent. higher than the reduced rates specified herein; provided, that in no case shall such higher charge be less than one (1) cent. per 100 lbs.  *  *  *

"The rates and classification of live stock as given in this tariff are based upon the following maximum valuations:

"If cattle or cows, not exceeding $75 each.  *  *  *

"The owner or his agent may accompany each consignment of horses or mules, car loads or less, to care for same, and will be carried free. One man *may* be carried free *in charge* of and going with each consignment of cattle, calves, hogs, goats, or sheep, when in car loads, to care for them. The permit or authority to ride free to be good only on train with such stock. No free return passage to be given. Men in charge of live stock, entitled to free transportation under the provisions of the live stock classification, will be carried free only upon presentation of permits therefor signed by the railroad agents at points of shipment; it being understood that railroad companies reserve the right to reject or refuse, through their agents, to issue such orders or permits for free transportation to any person or party who, in the opinion of said agents, is not considered a responsible party or proper attendant."

The rate on the schedule filed by the Erie Railroad from Chicago to Pine Island, N. Y., for cattle, is 28 cents per 100 pounds in car loads.

At the close of the case the defendant moved for the direction of a verdict, upon the ground that the release of liability executed by the plaintiff is valid, and is a bar to this action under the laws of the United States; that neither the law of Ohio nor the law of Illinois is applicable; that, if the law of any state applies, it is that of the state of New York, by which the release referred to is valid; and on the further ground that the plaintiff was not a passenger for hire on defendant's train, and was not entitled to recover on the evidence. It was consented that the decision on said motion should be reserved; the court stating:

"I will submit the whole question of negligence to the jury. If I subsequently determine that under this Interstate Commerce Law the plaintiff cannot recover I will so decide and direct a verdict."

The case was thereupon submitted to the jury, who returned a verdict for the plaintiff for $2,500. Subsequently the motion to direct

a verdict for the defendant was denied, and an exception granted to the defendant. No motion was made for a new trial. This appeal is taken from the judgment.

So far as this court is concerned, no question of negligence or of the amount of the recovery is argued. The question is one of law: Whether, under the provisions of the contract and release exempting the defendant from liability, the plaintiff can nevertheless recover damages for injuries caused by the negligence of the defendant or its employés. I will consider this under two heads: (1) The state laws; (2) under the Interstate Commerce Act.

[1] 1. It is the settled law of the state of New York that a person riding upon a drover's pass is a gratuitous passenger, and that a release from liability for injury caused by the negligence of the carrier or its servants is valid and bars recovery. Bissell v. N. Y. C. R. R. Co., 25 N. Y. 442, 82 Am. Dec. 369; Poucher v. N. Y. C. R. Co., 49 N. Y. 263, 10 Am. Rep. 364; Hodge v.' Rutland R. R. Co., 112 App. Div. 142, 97 N. Y. Supp. 1107; Id., 115 App. Div. 881, 100 N. Y. Supp. 764, affirmed 194 N. Y. 570, 88 N. E. 1121.

[2] It is the settled law of Illinois that such a person is a passenger for hire, that the release is invalid and the carrier liable for injuries received by reason of its or its employés' negligence: Ill. Cent. R. R. Co. v. Beebe, 174 Ill. 13, 50 N. E. 1019, 43 L. R. A. 210, 66 Am. St. Rep. 253; Ill. Cent. R. R. Co. v. Anderson, 184 Ill. 294, 56 N. E. 331. The law of Ohio is to the same effect. Cleveland, P. & A. R. R. Co. v. Curran, 19 Ohio St. 1, 2 Am. Rep. 362.

[3] This contract was made and release executed in Illinois, where it was invalid; the injury occurred in Ohio, where it was invalid; and the action is brought in New York, where, if made, it would have been valid. In Dyke v. Erie R. R. Co., 45 N. Y. 113, 6 Am. Rep. 43, the court said:

"The lex loci contractus determines the nature, validity, obligation, and legal effect of the contract, and gives the rule of construction and interpretation, unless it appears to have been made with reference to the laws and usages of some other state or government, as when it is to be performed in another place, and then, in conformity to the presumed intention of the parties, the law of the place of performance furnishes the rule of interpretation."

In Fish v. Delaware, Lackawanna & Western R. R. Co., 158 App. Div. 92, 143 N. Y. Supp. 365, the plaintiff, while traveling on a drover's pass, pursuant to a contract and release, from Jackson, Mich., to Balston Spa, N. Y., by way of defendant's railroad from Buffalo to Binghamton, was injured at Elmira, in the state of New York. Mr. Justice Lyon, writing for the Appellate Division in the Third Department, said:

"Under the decisions of this state the contract and release are valid" (citing the Hodge Case, supra). It was "conceded that 'if the law of Michigan controls the contract is invalid; if the law of New York, it is valid.' * * * A similar contract and release were held to be invalid in the state of Michigan in the case of Weaver v. Ann Arbor Railroad Co., 139 Mich. 590 [102 N. W. 1037, 5 Ann. Cas. 764], which was an action brought to recover damages on account of personal injuries sustained by plaintiff who was being transported within the state. * * * The court held that the plaintiff was rightfully

riding as a passenger for hire, and that the release executed by him was in-valid upon the ground of public policy, and that the defendant as a common carrier of passengers could not lawfully stipulate for exemption from responsibility for its own negligence."

The court also quoted from Hughes v. Pennsylvania R. R. Co., 202 Pa. 222, 51 Atl. 990, 63 L. R. A. 513, 97 Am. St. Rep. 713:

"Where a contract containing a stipulation limiting liability for negligence on the part of a common carrier is made in one state, but with a view to its performance by transportation through or into one or more other states, it should be construed in accordance with the law of the state where its negligent breach causing injury occurs."

And he concluded:

"I think that no contractual relation existed between the plaintiff and defendant, and that the contract and release did not become binding as between them until the plaintiff was received by the defendant at Buffalo for transportation over its line, and hence that the validity of the contract and release as between the plaintiff and defendant is governed as to the negligence of the defendant by the laws of the state of New York, and that such must be presumed to have been the intention of the parties at the time the contract and release were executed."

In Grand v. Livingston, 4 App. Div. 589, 38 N. Y. Supp. 490, affirmed on opinion below 158 N. Y. 688, 53 N. E. 1125, plaintiff shipped at Boston a quantity of horses to be transported to Buffalo under a contract or release there executed exempting the carrier from liability for injury caused by its negligence or that of its agents or servants. Mr. Justice Adams said:

"This instrument is as broad and comprehensive in its terms as language can possibly make it, and, if valid, amounts to an absolute release of the defendant from all liability for duty omitted, as well as for affirmative acts of negligence, however gross may be their character. Such a contract has never been recognized as possessing any validity in the state of Massachusetts [citing cases], while, upon the other hand, the courts of this state have held, and it is now the accepted law of the state, that carriers may, by express stipulation, limit their common-law liability to the extent of relieving themselves from the consequences of their negligent acts."

He held that the contract was to be interpreted according to the law of Massachusetts, and the plaintiff was entitled to recover.

In Valk v. Erie R. R. Co., 130 App. Div. 446, 114 N. Y. Supp. 964, the action was against a common carrier for the destruction of goods by fire, while in transit, in the warehouse of the defendant on the dock at Buffalo. The goods were being transported from Chicago under a through bill of lading to New York. The bill of lading contained conditions releasing the carrier from liability for damage to the property caused by fire. Mr. Justice Laughlin said:

"The undisputed evidence showed that by virtue of statutory law of the state of Illinois, as construed by the court of last resort of that state, such provisions in a bill of lading, either for a shipment where delivery was to be made within or without the state formed no part of the contract unless accepted in writing by the shipper, or unless it appeared that the shipper expressly assented thereto. There is no evidence of such acceptance or assent in the case at bar. There was no statutory provision in this state forbidding a common carrier to thus limit its liability without the express consent of the shipper, and the rule is here well settled that the shipper becomes bound

by the provisions of the bill of lading which is delivered to him, or to his duly authorized agent, without any express assent thereto on his part either in writing or otherwise. * * * We are of the opinion that the court erred in applying the law of the state of New York in determining what this contract was. * * * The Circuit Court of Appeals of the United States, in an action against this defendant for property destroyed by the same fire, has applied this rule, and held that the law of the place of shipment governs upon this precise point as to whether provisions in the bill of lading restricting the common-law liability of the carrier became a binding part of the contract. Erie R. R. Co. v. Pond Creek Mill & E. Co., 162 Fed. 878 [89 C. C. A. 568]."

From these cases it clearly appears that the validity of the contract and release is to be construed, either according to the law of the state of Illinois, where they were executed, or by the law of the state of Ohio, where the accident and injury occurred. In no event is the law of this state applicable. It therefore follows ·that, considering the, case as arising and to be determined under the state laws, the contract and release being invalid both by the laws of Illinois and Ohio, the motion to direct a verdict by the defendant was properly denied, and the judgment should be affirmed.

[4] 2. The defendant claims that the case comes within the Interstate Commerce Law, which is exclusive; that it had duly filed with the Interstate Commerce Commission its schedules, rates, tariffs, and classification; as among said documents appeared the form of the contract and release under consideration, thereby said contract and release became authorized as legal by act of Congress; therefore all state law, statute or common, declaring such provisions invalid, was superseded, and hence it is the law of the United States that it, as a common carrier, can contract to relieve itself from all liability for its own negligence. If the Congress of the United States by direct enactment had so legislated, of course, there could be no question as to its power. It has been given by the Constitution complete jurisdiction of interstate commerce, if and when it chooses to exercise it. But it is a startling proposition that, without a word on the subject in any act of Congress, the settled policy of the United States, announced in innumerable cases by the Supreme Court, has been completely overturned by the mere filing of a form of contract and release with an administrative board. Let us see what the policy of the United States has been, and in what way the Supreme Court has determined that the power of Congress has been extended over the field of interstate commerce, and how far it has gone, and what its limitations are. The leading case which has been. cited and followed to date, and has never been questioned, is N. Y. C. R. R. Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627. That case went up from the United States Circuit Court for the Southern District of New York. Lockwood was a drover, injured while traveling on a stock train of the New York Central Railroad Company proceeding from Buffalo to New York. He had cattle on the train. He had been required at Buffalo to sign an agreement to attend to the loading, transporting, and unloading of said cattle, and to take all risk of personal injury to himself, and had received a drover's pass declaring that the acceptance of the pass was to be considered a waiver of all claims for damages or injuries received on the train. The Supreme Court flatly refused

to follow the decisions of this state, and, holding that it was against public policy to permit a railroad company to stipulate relief from the results of its own negligence, came to the following conclusions:

"First. That a common carrier cannot lawfully stipulate for exemption from responsibility, when such exemption is not just and reasonable in the eye of the law.

"Secondly. That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants.

"Thirdly. That these rules apply both to carriers of goods and carriers of passengers for hire, and with special force to the latter.

"Fourthly. That a drover traveling on a pass, such as was given in this case, for the purpose of taking care of his stock on the train, is a passenger for hire."

The rule that a person rightfully riding on a drover's pass is a passenger for hire has been laid down in most of the states of the Union. See Elliott on Railroads, § 1605. Chicago, Milwaukee & St. Paul R. R. Co. v. Solan, 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688, decided in 1898, was an action brought in Iowa, where a statute prohibited any contract, receipt, rule, or regulation which exempted a common carrier from liability. Plaintiff was a drover, traveling on a contract expressly stipulating that the company should in no event be liable for any injury to his person in any amount exceeding $500. Plaintiff was injured, and recovered a verdict of $1,000. The company took the case to the United States Supreme Court. In affirming, Gray, J., said:

"By the law of this country, as declared by this court, in the absence of any statute controlling the subject, any contract by which a common carrier of goods or passengers undertakes to exempt himself from all responsibility for loss or damage arising from the negligence of himself or his servants is void as against public policy, as attempting to put off the essential duties resting upon every public carrier by virtue of his employment, and as tending to defeat the fundamental principle on which the law of common carriers was established—the securing of the utmost care and diligence in the performance of their important duties to the public [citing cases]. In the leading case of Railroad Co. v. Lockwood it was accordingly adjudged that an agreement in writing with a railroad company, by which a drover traveling with his cattle upon one of its trains, in consideration of his cattle being carried at less rates, stipulated to take all risk of injury to them and of personal injury to himself, did not exempt the company from all responsibility for injuries to him caused by the negligence of its servants. * * * The question of the right of a railroad corporation to contract for exemption from liability for its own negligence is, indeed, like other questions affecting its liability as a common carrier of goods or passengers, one of those questions, not merely of local law, but of commercial law or general jurisprudence, upon which this court, in the absence of express statute regulating the subject, will exercise its own judgment, uncontrolled by the decisions of the courts of the state in which the cause of action arises. But the law to be applied is none the less the law of the state, and may be changed by its Legislature, except so far as restrained by the Constitution of the state or by the Constitution or laws of the United States."

These decisions, declaring public policy upon the question by the Supreme Court of the United States, were delivered before effective and exclusive interstate commerce legislation by Congress. The original Interstate Commerce Act of February 4, 1887, was amended by the Act of June 29, 1906, which took effect 60 days thereafter.

Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154) as amended by Act June 24, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1284); Joint Res. No. 47, June 30, 1906, 34 Stat. 838. The twentieth section as amended, generally referred to as the Carmack amendment to the Hepburn bill, is as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed." Act Feb. 4, 1887, c. 104, § 20, 24 Stat. 386 (U. S. Comp. St. Supp. 1911, p. 3169), amended by Act June 29, 1906, c. 3591, § 7, pars. 11, 12, 34 Stat. 593 (U. S. Comp. St. Supp. 1911, p. 1307).

The effect of that amendment upon stipulations limiting liability for loss of goods by carriers based upon valuation thereof has been considered by the Supreme Court of the United States in a series of cases collected and considered by this court in Barstow v. New York, New Haven & H. R. R. Co., 158 App. Div. 665, 143 N. Y. Supp. 983. Those cases held that such a limitation based upon valuation was valid, so far as goods carried as express or freight were concerned. This court held that it was equally valid so far as passengers' baggage was concerned, though we pointed out that certain decisions in certain state courts were to the contrary, including Hooker v. Boston & Maine R. R., 209 Mass. 598, 95 N. E. 945, Ann. Cas. 1912B, 669, which case, however, since the writing of the Barstow opinion, has been reversed by the Supreme Court of the United States. In Boyle v. Bush Terminal R. R. Co., 210 N. Y. 389, 104 N. E. 933, Miller, J., said:

"Although the rule in the federal courts, unlike that prevailing in this state, has always been that a common carrier could not exempt himself from liability for negligence, even by express words, it is settled by the decisions of the United States Supreme Court that a contract limiting liability to a value agreed upon for the purpose of fixing the rate is valid, and that holding is based on the principles of the common law, and not, as is said, on the provisions of the so-called Carmack Amendment. Adams Express Co. v. Croninger, 226 U. S. 491, and cases cited on page 510 [33 Sup. Ct. 148, 153, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257]; Kansas City Southern Ry. Co. v. Carl, 227 U. S. 639 [33 Sup. Ct. 391, 57 L. Ed. 683]; Mo., Kan. & Tex. Ry. Co. v. Harriman, 227 U. S. 657 [33 Sup. Ct. 397, 57 L. Ed. 690]. The question considered in those cases, as far as that amendment was concerned, was whether it prevented, not whether it permitted, the making of such contracts."

But it is important to examine the basis of the argument in those cases to see whether it is applicable to the case at bar. In the Croninger Case, supra, Lurton, J., said:

"That a common carrier cannot exempt himself from liability for his own negligence or that of his servants is elementary. York Mfg. Co. v. Ill. C. R. Co., 3 Wall. 107 [18 L. Ed. 170]; N. Y. C. R. R. Co. v. Lockwood, 17 Wall. 357 [21 L. Ed. 627]; Bank of Kentucky v. Adams Express Co., 93 U. S. 174 [23 L. Ed. 872]; Hart v. Penn. R. R. Co., 112 U. S. 331 [5 Sup. Ct. 151, 28 L. Ed. 717]. The rule of the common law did not limit his liability to loss and damage due to his own negligence, or that of his servants. That rule went

beyond this, and he was liable for any loss or damage which resulted from human agency, or any cause not the act of God or the public enemy. But the rigor of this liability might be modified through any fair, reasonable, and just agreement with the shipper which did not include exemption against the negligence of the carrier or his servants. * * * It has therefore become an established rule of the common law, as declared by this court in many cases, that such a carrier may, by a fair, open, just, and reasonable agreement, limit the amount recoverable by a shipper in case of loss or damage to an agreed- value, made for the purpose of obtaining the lower of two or more rates of charges proportioned to * * * the risk. * * * The limitation as to value has no tendency to exempt from liability for negligence. * * * The statutory liability, aside from responsibility for the default of a connecting carrier in the route, is not beyond the liability imposed by the common law, as that body of law applicable to carriers has been interpreted by this court, as well as many courts of the States. * * * The exemption forbidden is, as stated in the case last cited [Bernard v. Adams Express Co., 205 Mass. 254, 91 N. E. 325, 28 L. R. A. (N. S.) 293, 18 Ann. Cas. 351], 'a statutory declaration that a contract of exemption from liability for negligence is against public policy and void.' This is no more than this court, as well as other courts administering the same general common law, have many times declared."

In the Carl Case, supra, the court said: ·

"If such a valuation be made in good faith, for the purpose of obtaining the lower rate applicable to a shipment of the declared value, there is no exemption from carrier liability due to negligence forbidden by the statute when the shipper is limited to a recovery of the value so declared."

These cases, therefore, while upholding a limitation of liability based on value, instead of reversing, reassert the public policy, steadily announced by the Supreme Court, that a carrier may not relieve himself of all liability for his own negligence.

In Santa Fé, P. & P. Ry. Co. v. Grant Bros., 228 U. S. 177, 33 Sup. Ct. 474, 57 L. Ed. 787, decided April 7, 1913, the Supreme Court again announced its position in the most emphatic manner; Mr. Justice Hughes saying:

"It is the established doctrine of this court that common carriers cannot secure immunity from liability for their negligence by any sort of stipulation [citing cases]. The rule rests on broad grounds of public policy, justifying the restriction of liberty of contract because of the public ends to be achieved. The great object of the law governing common carriers was to secure the utmost care in the rendering of a service of the highest importance to the community. A carrier who stipulates not to be bound to the exercise of care and diligence 'seeks to put off the *essential duties* of his employment.' It is recognized that the carrier and the individual customer are not on an equal footing. 'The latter cannot afford to higgle or stand out and seek redress in the courts. * * * He prefers, rather, to accept any bill of lading, or sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases, he has no alternative but to do this or abandon his business.' New York C. R. R. Co. v. Lockwood, 17 Wall. 378, 379 [21 L. Ed. 627]. For these reasons, the common carrier, in the prosecution of its business as such, is not permitted to drop its character and transmute itself by contract into a mere bailee, with right to stipulate against the consequences of its negligence."

In Missouri, K. & T. R. R. Co. v. Harriman Bros., 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 690, the court said:

"The liability imposed by the statute is the liability imposed by the common law upon a common carrier, and may be limited or qualified by special

· 147 N.Y.S.—24

contract with the shipper, provided the limitation or qualification be just and reasonable, and does not exempt from loss or responsibility due to negligence [citing cases]."

Because the Interstate Commerce Act makes provision for the filing of tariffs, etc., and contains a provision for passes to drovers, the appellant argues that the release is valid. In addition to the Carmack amendment, quoted supra, the only provision of the Interstate Commerce Act of February 4, 1887, as amended by the acts of June 28, 1906, and June 18, 1910, at all applicable, seems to be the following:

Section 1: "And it is hereby made the duty of all common carriers subject to the provisions of this act to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substances of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing and delivery of property subject to the provisions of this act which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this Act upon just and reasonable terms and every such unjust and unreasonable classification, regulation, and practice with reference to commerce between the states and with foreign countries is prohibited and declared to be unlawful.

"No common carrier subject to the provisions of this act shall, after January 1, 1907, directly or indirectly issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employés and their families, its officers, agents, surgeons, and physicians, and attorneys at law, * * * to necessary caretakers of live stock, poultry, milk, and fruit. * * * Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than $100, nor more than $2,000, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass, or free transportation shall be subject to a like penalty."

"Sec. 6. That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection, schedules showing all the rates, fares and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. * * * The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the services rendered to the passenger, shipper or consignee. * * *

"No carrier, unless otherwise provided by this act shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any services in connection therewith, between the points named in such tariffs than the rates, fares, and charges

which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property except such as are specified in such tariffs."

In Southern Pacific Co. v. Schuyler, 227 U. S. 601, 33 Sup. Ct. 277, 57 L. Ed. 662, 43 L. R. A. (N. S.) 901, plaintiff's intestate, an employé of the railway mail service, not on duty, was killed by the derailment of the train on which he was riding, with the knowledge of the train agent and conductor, on a certificate signed by the Postmaster General. The defense was that he was not traveling on official business that entitled him to free transportation under his commission, and that in riding free he was violating the act of Congress of January 29, 1906, which forbids common carriers subject to the provisions of the act after January, 1907, to "directly or indirectly issue or give any interstate free ticket, free pass or free transportation for passengers except * * * to railway service employés. * * *" It was contended that the deceased was a trespasser, and the defendant was under no legal duty to care for his safety. The case came up from the Supreme Court of Utah, which affirmed a judgment for the plaintiff below, and held that the Hepburn Act did not forbid a carrier from giving free interstate transportation to a railway mail service employé when not on duty, and said:

"We are of the opinion that when a common carrier accepts a person as a passenger, he is not permitted to deny that he owes to him the duty of diligence, prudence, and skill which, as carrying on a public employment, he owes to all his passengers, and that he cannot escape liability for a negligent performance of that duty, resulting in injury, by urging that the pass or commission was issued, or the gratuitous passage permitted, by him in violation of law."

Mr. Justice Pitney said:

"Whether the Hepburn Act prohibits a carrier from giving free interstate transportation to the employés of the railway mail service when they are not on duty, but are traveling for their own benefit or pleasure, is, of course, a federal question. But whether—assuming that question to be answered in the affirmative—the relation of carrier and passenger arises in the case of gratuitous passage under circumstances such as are presented in this case is (in the absence of an act of Congress regulating the matter) a question not of federal, but of state, law. * * * We have examined the evidence in the record, and find that it fairly supports the conclusion of the state court that the deceased was accepted by plaintiff in error as a gratuitous passenger. But, finally, it is argued that it was beyond the power of the state court to 'read into the Hepburn Act an exception in favor of gratuitous passengers,' thereby (as is said) enlarging the class to whom Congress limited the right of free interstate transportation. This is ingenious, but, as we think, unsound. As applied to the concrete case, it is equivalent to saying that the operation of the Hepburn Act is such as to deprive one who, in good faith and without fraud, and with the consent of the carrier, but in actual, though unintentional, violation of the prohibition of the act, accepts a free passage in interstate transportation, of the benefit of a local [rule of] law that renders the carrier in such circumstances responsible for exercising care for the passenger's safety because the carrier has voluntarily undertaken the burden of such care. But the act itself declares what penalty shall be imposed for a violation of its prohibition. * * * This penalty is not to be enlarged by construction. Neither the letter nor the spirit of the act makes an outlaw of him who violates its prohibition by either giving or accepting

gratuitous interstate carriage. The deceased no more forfeited his life, limb, or safety, and no more forfeited his right to the protection accorded by the local law to a passenger in his situation, than the carrier forfeited its right of property in the mail car upon which the deceased rode. His right to safe carriage was not derived, according to the law of Utah, from the contract made between him and the carrier, and therefore was not deduced from the supposed violation of the Hepburn Act. It arose from the fact that he was a human being, of whose safety the plaintiff in error had undertaken the charge. With its consent he had placed his life in its keeping, and the local law thereupon imposed a duty upon the carrier, irrespective of the contract of carriage. The Hepburn Act does not deprive one who accepts gratuitous carriage, under such circumstances, of the benefit and protection of the law of the state in this regard."

We are of the opinion that the appellant derives no help from the interstate commerce law. The act itself only authorizes just and reasonable terms, "and every such unjust and unreasonable classification, regulation, and practice * * * is prohibited and declared to be unlawful." In the light of the repeated acts of Congress covering the safety of passengers and providing for compensation for employés injured while engaged in interstate commerce, and the repeated declarations of the Supreme Court of the United States that contracts and releases of liability for the negligence of carriers are against public policy, it is unthinkable that that policy can be held to have been subverted by the mere filing of the form of the papers with the Interstate Commerce Commission. The "terms" "regulation" and "practice" were "unjust and unreasonable," and hence "prohibited and unlawful."

The respondent was not a gratuitous passenger under the law established by Illinois, by Ohio, and by the United States Supreme Court. The contract was for the conveyance of cattle. It provided that:

"The said shipper is at his own sole risk and expense to load and take care of, and to feed and water, said stock whilst being transported, whether delayed in transit or otherwise, and to unload the same, and neither said carrier nor any connecting carrier is to be under any liability or duty with reference thereto except in the actual transportation of the same."

But these things had to be done. The carrier, having refused to do them, provided that the plaintiff should be carried on its train to attend to these necessary matters, "without charge *other* than the sum paid for the transportation of the live stock in his charge." He was allowed to be so carried by the express terms of the Hepburn Act, and the release he was compelled to sign was invalid in the state where executed, in the state where the injury was sustained, and against the public policy declared by the Supreme Court of the United States.

The judgment appealed from should be affirmed, with costs.

LAUGHLIN and SCOTT, JJ., concur.

INGRAHAM, P. J. I concur in the affirmance of this judgment. By the interstate commerce law (Act Feb. 4, 1887, c. 104, as amended by Act June 18, 1910, c. 309), Congress has, it seems to me, taken control of the subject of interstate commerce, and the action of

Congress is therefore exclusive. By section 1 of that act it is provided
.that:

"The provisions of this act shall apply to * * * any common carrier
or carriers engaged in the transportation of passengers or property wholly
by railroad * * * from one state or territory of the United States or
the District of Columbia, to any other state or territory of the United States
or the District of Columbia; * * * and it shall be the duty of every car-
rier subject to the provisions of 'this act to provide and furnish such trans-
portation 'upon reasonable request therefor, and to establish through routes
and just and reasonable rates applicable thereto, and to provide reasonable
facilities for operating such through routes and to make reasonable rules
and regulations with respect to the exchange, interchange and return of cars
used therein, and for the operation of such through routes, and providing
for reasonable compensation to those entitled thereto."

And further:

"No common carrier subject to the provisions of this act shall, after
January first, nineteen hundred and seven, directly or indirectly, issue or
give any interstate free ticket, free pass, or free transportation for passen-
gers, except * * * to necessary caretakers of live stock, poultry, milk,
and fruit. * * ' * "

By this enactment Congress has undertaken to regulate the trans-
portation of passengers and property from one state to another, the
charges for such transportation, and prohibited free transportation,
except in certain specified instances. By expressly allowing the free
transportation of "necessary caretakers of live stock," the agreements
or contracts under which such caretakers were to be transported came
within the supervision of the federal government and its regulations
and general policy and control, and it is expressly provided that:

"All charges made for any service rendered or to be rendered in the trans-
portation of passengers or property and for the transmission of messages by
telegraph, telephone or cable, as aforesaid, or in connection therewith, shall
be just and reasonable; and every unjust and unreasonable charge for such
service or any part thereof is prohibited and declared to be unlawful."

The defendant, as a common carrier, was bound to transport for
the plaintiff his live stock from the state of Illinois to the state of New
York. For such service, which included the transportation of the
live stock and the transportation of the plaintiff as the caretaker, it
was entitled to recover the reasonable compensation as had been
established under the provisions of the act of Congress. If the charges
for this service were unjust and unreasonable, Congress has declared
such a charge to be unlawful. Thus Congress had taken within its
control the whole subject of the transportation of passengers and
merchandise, including the transportation of a caretaker for live stock,
and it imposed upon the carrier certain duties in relation to the rendi-
tion of such services and regulated the compensation which it was to
receive therefor. It seems to me, according to the principles estab-
lished in Southern Railway Co. v. Reid, 222 U. S. 435, 32 Sup.
Ct. 141, 56 L. Ed. 257, this brought the whole subject within the con-
trol of the federal government, so that it comes within the third class
mentioned in that case; i. e., "those in which Congress is exclusive
and the state cannot act at all." In Southern Pacific Co. v. Schuyler,
227 U. S. 601, 33 Sup. Ct. 277, 57 L. Ed. 662, 43 L. R. A. (N. S.)

901, it was held that whether the anti-pass provision of the Hepburn Act prohibits carriers from giving free interstate transportation to employés of the railway mail service when they are not on duty but traveling for their own benefit or pleasure is a federal question, but the question whether the relation of carrier and passenger arises in the case of a gratuitous passage is, in the absence of an act of Congress regulating the matter, a question not of federal but of state law. As it was said:

"Neither the letter nor the spirit of the act makes an outlaw of him who violates its prohibition by either giving or accepting gratuitous interstate carriage."

These two cases, I think, illustrate the extent to which by this act now under consideration Congress has taken control of interstate commerce. It has determined who shall and who shall not be carried by carriers engaged in interstate commerce without payment of the fare or charges for the service rendered. It regulates and determines the rates that shall be charged for transportation of persons or merchandise and the contracts under which such service is to be performed; but it has not attempted to relieve the carrier from liability to a person traveling in violation of the act for negligence in the performance of the duty which it has assumed. The agreements or contracts under which interstate commerce is carried on, the rates paid or charges made for such service, are, it seems to me, brought within the jurisdiction of the federal authority, and as to such agreements or contracts the federal jurisdiction must necessarily control, and the local regulations of the several states, or the public policy of the several states, is superseded by the law as established and enforced by the general government. The whole matter, so far as the regulation of interstate commerce is concerned, has passed from the control of the states to the control of the federal government. The validity of any contract for services rendered or to be rendered in the transportation of passengers or property is thus regulated by the law of the general government. By the act every unjust or unreasonable charge for such service is declared to be unlawful. Therefore the question as to whether a charge is reasonable or unreasonable, is just or unjust, or a contract for transportation is valid or invalid, is a federal question, to be determined by the laws of the United States.

In this case the question is whether the contract signed by the parties is valid or enforceable. Under the act of Congress plaintiff was entitled to have his goods transported. Where a contract was made in the performance of that duty imposed by Congress, such contract was, I think, to be governed and construed by the federal law under which it was executed.

Assuming, therefore, that the contract under which this shipment was made was under the control of the laws of the United States, the question whether or not such a contract as was made by the plaintiff in this case, relieving the carrier from liability for its own negligence, was void, must, as I view it, depend upon the laws of the United States, and not upon the laws of the state in which the contract was made, or the states through which it was to operate. There

can be no question but what the Supreme Court of the United States has consistently held such a contract to be void as against its public policy. Since the case of N. Y. C. R. R. Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627, such contracts have been absolutely void and un-enforceable in the courts of the United States. In that case the con-clusion was based upon the proposition that a common carrier cannot lawfully stipulate for exemption from responsibility, when such ex-emption is not just and reasonable in the eye of the law; that it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants; that a drover traveling on a pass, such as was given in this case, for the purpose of taking care of his stock on the train, is a passenger for hire. This was again reaffirmed in Chicago, M. & St. P. R. R. Co. v. Solan, 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688, where it was held that by the law of this country, in the absence of any statute controlling the subject, any contract by which a common carrier of goods or passengers undertakes to exempt him-self from all responsibility for loss or damage arising from the neg-ligence of himself or his servants is void as against public policy. In Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257, it was said:

"That a common carrier cannot exempt himself from liability for his own negligence or that of his servants is elementary."

In Santa Fé P. & P. Ry. Co. v. Grant Bros., 228 U. S. 177, 33 Sup. Ct. 474, 57 L. Ed. 787, the court again announced the general rule, saying:

"It is the established doctrine of this court that common carriers cannot secure immunity from liability for their negligence by any sort of stipulation."

Therefore, if the common law as determined by the Supreme Court of the United States is to control interstate shipments, this contract, under which the defendant claims immunity, was absolutely void, and it would be the foundation for no defense against plaintiff's claim for damages for negligence, unless such a contract has been validated by act of Congress.

By section 6 of the Interstate Commerce Act, as amended, it is pro-vided:

"That every common carrier subject to the provisions of this act shall file with the commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transporta-tion between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line or by water when a through route and joint route have been established. * * * No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are trans-ported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, be-tween the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time."

This section relates solely to the rates, fares, and charges for transportation. It does not attempt to validate contracts which were void as against the public policy of the United States at the time that the act was passed. As I read the act, it did not change the public policy of the United States, which refuses to enforce such contracts. The common carrier, by filing a tariff with the Commission created by the act, could not, as I view it, change the whole public policy of the United States, and validate contracts which that public policy had declared void and unenforceable. The charge to be collected by the carrier was fixed, and from that charge the carrier could not deviate. For that charge the passenger or shipper was entitled to the services rendered; but before the tariff was fixed a contract exempting the carrier from liability for its own or its employé's negligence was unlawful, and it remained unlawful until Congress should by some express provision change the law of the United States and render such a contract enforceable.

My conclusion, therefore, is that Congress has taken within its exclusive control all interstate commerce, and that thereby the general law of the United States becomes applicable to interstate shipments; that by the law of the United States any contract exempting the carrier from liability for its own negligence, or the negligence of its servants, is unlawful and void; and that Congress has not by any provision validated such a contract. Therefore it was no defense to the action that the shipper had signed a contract relieving the carrier from liability for its own negligence.

It follows that the judgment was right, and should be affirmed.

McLAUGHLIN, J., concurs.