- ANDERSON *v.* MANISTIQUE & LAKE SUPERIOR
RAILWAY CO.

RAILROADS—NEGLIGENCE—PERSONAL INJURIES—LOOKOUT—ISSUES—
TRIAL—INSTRUCTIONS.

In an action for personal injuries to a two-year-old boy
who was injured when an engine was coupled onto a box
car under which he was playing, failure of the trial judge
to instruct the jury as to the measure of duty of de-
fendant under the circumstances, and to submit to them
any question of disputed fact, *held*, reversible error.

Error to Schoolcraft; Collingwood, J., presiding.
Submitted April 10, 1919. (Docket No. 29.) Decided
May 29, 1919.

Case by Leo Anderson, an infant, by his next friend,
against the Manistique & Lake Superior Railway Com-
pany for personal injuries. Judgment for plaintiff.
Defendant brings error. Reversed.

*C. W. Dunton,* for appellant.
*McDonald & Kaltz,* for appellee.

A switch track of defendant bisects a square in
Manistique, running through it north and south, the
block, north and south, being, approximately, 575 feet,
and bounded on the north by Beaver street, on the
south by Otter street, on the east by Chippewa and
on the west by Schoolcraft avenues. The houses face
upon the avenues, and it is approximately 125 feet
from the rear of the houses to the track. The right
of way is not fenced. There are eight houses fronting
Chippewa and eight Schoolcraft avenues. Going south
from Beaver street, on Chippewa avenue, the houses
are, in order, Desautel's, Gardiner's, Bowman's, An-
derson's, Ranney's. On August 27, 1917, there were

On duty of railroad company to keep lookout for trespassers
on track, see notes in 25 L. R. A. 289; 8 L. R. A. (N. S.) 1069;
41 L. R. A. (N. S.) 264.

four cars standing on the track in this square and a locomotive ran down from the north to take them out. It was in charge of the switching crew of five men, the conductor and two switchmen, the engineer and a fireman. The plaintiff, an infant, a little more than two years old, was under one of the standing cars, the second one from the north. When the coupling was made, the standing cars were moved, and a wheel or wheels ran over the plaintiff's hand.

It does not seem to be claimed that however they may have been placed on the locomotive, or, if it was pushing a car, and there was a lookout on the car, defendant's servants could have seen the child. There are a considerable number of children living in the square above described, and they sometimes crossed over the right of way. Defendant's servants had upon various occasions warned school children found on or near the right of way.

In the declaration it is alleged:

"That the negligence of said defendant, its agents, servants and employees consisted in pushing cars ahead of an engine on said spur or sidetrack in a populous part of Manistique, without a brakeman or other employee on the forward car and without a watchman or lookout of any kind at the head of the train as such cars were being driven over and across street crossings and through a thickly-settled portion of the city of Manistique, in said county; and in failing to ring the bell or blow the whistle or give any warning that said engine and cars were so moving on said track were to cross said streets and come into collision with the box cars or flat cars standing thereon, under which plaintiff lawfully was; and in failing to properly and safely protect and guard said sidetrack and railway right-of-way by fencing or otherwise so as to prevent children of immature age from going thereon; and in failing to inspect said standing cars before moving the same, to avoid injury to minor children attracted thereby; and in carelessly, heedlessly, negligently, recklessly, wantonly and wilfully running said engine

and cars into the standing flat cars or box cars under which plaintiff lawfully was when notified of the danger to the plaintiff; and in carelessly, negligently, heedlessly, wilfully, wantonly and recklessly neglecting and refusing to bring said moving cars and engine to a stop before coming into collision with the standing flat cars or box cars under and beneath which plaintiff lawfully was when notified of the danger to plaintiff; and in carelessly, negligently, heedlessly, wantonly and wilfully neglecting and refusing to stop said engine and cars before collision with the flat cars or box cars standing on said railway under and beneath which plaintiff lawfully was when notified that there was danger in moving said engine and cars; and in carelessly, negligently, heedlessly, wantonly, wilfully and recklessly failing to stop and inquire the reason for the alarm raised by persons and individuals along said railway right-of-way hastening toward the said moving engine and cars under such circumstances and conditions which ought to apprise said defendant, its agents, servants and employees that there was immediate and pressing necessity for bringing said engine and cars to a stop; and in carelessly, heedlessly and negligently refusing to bring said moving engine and cars to a stop before coming into collision with the standing cars on said sidetrack when notified so to do, and in moving said engine and cars in violation of the rules of said defendant."

Any claim of negligence for not fencing the right of way was withdrawn.

A special question submitted to the jury by defendant, answered by them in the affirmative, was:

"Was a car attached ahead of the engine as the engine moved south on the track to couple on to the standing flat cars, under one of which the plaintiff was injured?"

Otherwise, the testimony for plaintiff tended to prove that the engine bell was not rung nor the whistle blown as the approach to the standing cars was made, that the standing car farthest north was about west from the Anderson home, and that the head of the

locomotive, when the coupling was made and the train was at rest, was in the rear of the Anderson lot, near the northwest corner thereof, that the train men could have seen the rear of all the houses on the east side of the square, that Mrs. Josephine Ranney, who lived next south of the Andersons, saw the plaintiff under a standing car nearly directly back of her porch and after she saw him there saw the engine coming south on the track just across Beaver street, that she ran to the north and towards the track, waved her hand or hands and cried out to the train crew that there was a baby on the track, that she could see some of the train crew and observed that once the conductor turned and looked towards her, that she ran to near the north line of the Anderson lot, that the locomotive was pushing a gondola car and there was no one observed by her on that car, that before the standing cars were reached by the locomotive the conductor left the engine and spoke with her, asking her what was the matter and she told him that "Anderson's baby was under the car," that no signal that she saw was given to stop the engine and that it did not stop until the coupling was made. As Mrs. Ranney was, perhaps, the principal witness for plaintiff, some of her cross-examination is set out here:

"The little child that I saw under the standing car was about west of where I stood on the porch. I think it would be due west of me. The child was behind the north truck of this car; he was standing up south of the north wheel. He had hold of those rods under the car. He was pretty close up to the wheel. I think that he was within a few feet of the north truck. I saw the engine coming; it was pushing a car as it came in there. The engine was running forward. The engine stopped about midway with the Anderson lot—directly west of the Anderson lot. It would be the center of the lot and about west of the Anderson house. The front part of the engine would be about

west of the Anderson house. When I run out there,
I do not know whether the train crew saw me or not.

"*Q.* The engine had come to a stop before the train
crew saw you?

"*A.* No, sir.

"*Q.* When did any member of the train crew see
you that you first know about?

"*A.* When Mr. Musgrove stepped off the engine.

"*Q.* Where were you at that time?

"*A.* Right close to the right-of-way and the railroad.

"*Q.* That is the first knowledge you had that any
of the train crew had seen you?

"*A.* Yes, sir.

"*Q.* And you think now that is where it was when
they first saw you?

"*A.* I don't know; as far as I know, it was the first
place. So far as I know, that is where it was when
they first saw me. When Mr. Musgrove stepped off,
he asked me what was the matter. I told him.

"*Q.* As soon as that happened, he flashed a signal?

"*A.* I didn't see him.

"*Q.* The engine came to a stop?

"*A.* No, sir.

"*Q.* How far did the engine move?

"*A.* I don't know.

"*Q.* A foot—Well, you wouldn't say that the engine
moved any distance of any consequence after that?

"*A.* It was moving all the time; it didn't stop. I
would not say that it moved any distance. I would
not say that it moved 20 feet or 10 feet; I would
not say it moved 5 feet. All the time that engine was
moving in there, it was coming very slow. I do not
know whether it would be as fast as a man would
walk. The engineer and fireman were in the cab, and
I think there was 3 men on the running board.

"*Q.* There is the footboard—which board was it, the
one in front or the one behind that they were on?

"*A.* The one at the back. During this time, I sup-
pose I was excited seeing that little child there. It
frightened me, of course, and I was certainly fright-
ened when I saw the situation. I became dazed. Just
as I saw the little boy fall down after they made the
connection, is the last that I remember. And when
I came to, I found myself over to the first house north

of the Anderson house. I have no distinct recollection as to how I got there. I am telling you what I saw there, as near as I can, from the frightened condition in which I was at that time. I knew what I was doing all that time. My recollection is clear, anyway. When it was all over, my nerves gave away, and I was excited after that. When I first saw the engine coming in there and knew the little child was under the car, I told my little girl to go to the track and get the baby. The first thing I did after observing the position, was to tell my little girl to go to the track and get the baby. The little girl started—she got about due south of the Anderson privy. I then passed her and told her to go back and tell Mrs. Anderson. I presume I went within 2 or 3 feet of her and called out to her to run for Mrs. Anderson. As far as I know she did so. I went out across about midway of the Anderson lot. As I went out there, the center of the Anderson lot towards the track, it would be about the center of the lot between the north and south. I passed over the line between our lot and the Anderson lot right back from the Anderson outhouse. I went back towards the track in about the middle of the Anderson lot, and came out near the right of way at that place, and that is where I had the talk with Mr. Musgrove, right close to the right of way.

"*Q.* You didn't hear any whistle, or didn't hear any bell rung?

"*A.* No, sir.

"*Q.* Trains frequently pass there on that track?

"*A.* Yes, sir.

"*Q.* Fifteen or twenty times a day?

"*A.* I don't know exactly.

"*Q.* You could see them—you don't pay very much attention to the switch engine?

"*A.* No, sir.

"*Q.* Nothing about the blowing of the whistle, or the ringing of the bell that would impress you, hearing it so frequently?

"*A.* Well, that day I would have heard it if it blew, because I was right there.

"*Q.* But you say that you didn't pay very much attention to the blowing of the whistle or ringing of the bell?

"A. If I am not out there watching, I didn't pay much attention, but that day if it would blow, I would hear it.

"Q. Do you recollect where the engine was when you first saw it?

"A. Yes, sir.

"Q. Where do you say that it was?

"A. I said it was just across Beaver street and coming toward the Anderson lot.

"Q. You are acquainted with directions there, are you not, east and west and north and south?

"A. I suppose so.

"Q. Are you sure, Mrs. Ranney, that that engine was pushing a car in front of it?

"A. Certainly.

"Q. Are you absolutely certain about that?

"A. If I wasn't, I wouldn't say so.

"Q. Are you as certain about that as you are about all the rest of your testimony?

"A. Yes, sir.

"Q. Did you hear the coupling made between the train that was moving in there and the standing car?

"A. No, sir.

"Q. Do you remember the moving train coming in contact with the car standing on the track?

"A. Yes, sir.

"Q. Do you know whether it was a severe blow or a light blow as they came together?

"A. It was a light blow.

"Q. The engine was moving very slowly, was it not?

"A. Yes, sir."

On redirect-examination she testified:

"Q. State whether or not, from the time you left the rear of your house and as you first saw the engine and car and started to holler, as to whether they were in plain view during all the time that you were going to the point where you finally stopped?

"A. The car ahead of the engine was.

"Q. Could you see them plainly?

"A. I saw them moving forward.

"Q. And as you got over there, out from your house, and crossing the Anderson lot, could you see the engine and car plainly?

"*A.* Yes, sir.

"*Q.* All the time until you got to the point where they finally stopped?

"*A.* Yes, sir.

"*Q.* On your direct examination, you said something about one of the men on this engine turning his head, what was there about that?

"*A.* I said he turned his head over his shoulder, and he looked back towards me.

"*Q.* What were you doing then?

"*A.* I was standing then.

"*Q.* Were you crying out?

"*A.* Of course.

"*Q.* And waving your hand at that time?

"*A.* Yes, sir.

"*Q.* About where was the engine and car then?

"*A.* The engine was just about—it was just across the line from Desautel's place onto Mr. Anderson's.

"*Q.* Well, Mr. Desautel's place is near Beaver street?

"*A.* Yes, sir.

"*Q.* Do you know the house next to his?

"*A.* Mr. Gardiner's.

"*Q.* Then comes Mr. Brown's?

"*A.* Mr. Bowman's.

"*Q.* And then Anderson's?

"*A.* Then Anderson's.

"*Q.* So that when this man looked over his shoulder towards you—

"*A.* Gardiner's lot, next to Desautel's.

"*Q.* It was about opposite Gardiner's lot, is that what you mean?

"*A.* Yes, sir.

"*Q.* You spoke of the conductor getting off the engine and talking to you?

"*A.* Yes, sir.

"*Q.* Where was the engine when he got off?

"*A.* Right close there when he looked over his shoulder and saw me.

"*Q.* Did he come towards where you were?

"*A.* He stepped off and ran towards me."

In some respects, the testimony of this witness was corroborated by another. A witness for plaintiff, Desautel, who was in or near his own house and also saw the child under the car, testified:

"My attention was first called by the scream of this woman; I instantly looked over and saw this child, and at the same time I saw the car moving. The impact of this engine must have moved that car. I say there was one car ahead of the engine.

"Q. Do you still say that when you heard this woman scream that the engine was back 175 feet from those cars?

"A. Yes, sir.

"Q. Explain to the jury how that could be.

"A. Well, when that woman was hollering, I noticed the train. I should judge, about that time about 175 feet, and she was hollering to those trainmen and all this time the train was going ahead, and was crawling closer to those cars.

"Q. You have told this jury that when you first heard her call out, you ran towards that car, you saw the child under the car, and you instantly saw the car move?

"A. Yes, sir.

"Q. And is that right?

"A. Yes, sir."

It is assigned as error that the court refused defendant's second, seventh, ninth and tenth requests to charge, did not more specifically point out in the general charge the degree of care required of the switching crew, and did not restrict the alleged negligence of defendant to certain alleged acts which contributed to the injury. The requests to charge referred to are:

"2. You are instructed that the plaintiff has failed to show any actionable negligence on the part of the defendant, and you will render your verdict of no cause of action.

"7. There is no testimony in the case that the switching crew or any member of the switching crew understood or comprehended the shouts, cries and motions which the witness, Mrs. Ranney, testifies she gave them until it was too late to stop the engine and avert the injury to the child; therefore, you can render no verdict against the defendant for its alleged negligence in this respect.

"9. It was the duty of the defendant and its crew at the time it moved its engine upon the track.to make a coupling with the standing cars in question, to be watchful and attentive and guard with reasonable care against possible accidents of all kinds, without special reference to any particular persons or things, to observe environments, watch where they were going and maintain such a lookout at all times as is reasonably required by the circumstances.

"If you are satisfied from the evidence, that such reasonable care was exercised by the defendant's train crew at the time in question, then you are instructed that it becomes your duty to return a verdict 'no cause of action' or 'not guilty.'

"10. Each of the allegations of negligence claimed by the plaintiff to have been committed by the defendant stands by itself. Each must be passed upon separately. Upon each of said allegations of negligence, the burden of proof is upon the plaintiff, and you can find the defendant guilty of no one of the negligent acts claimed unless the testimony upon that point satisfies you by a preponderance of the evidence that the alleged act was committed."

Error is assigned upon those portions of the charge which, with the context, read:

"Preponderance of the evidence does not mean number of witnesses. It means that evidence which convinces you by its reasonableness of its truth, and, in order to find defendant guilty of negligence, you must find that, as the engine came down the track to couple with the standing cars, the employees of the defendant did not exercise such reasonable care and diligence and prudence as an ordinarily prudent man should exercise.

"It is conceded that there were five men on that engine, one, the engineer, and one, the fireman, in their proper and appropriate places. It is conceded that there were three other men somewhere on the engine. Now, it becomes your duty to determine whether these men, all of them, or any of them, because you don't have to find that all of them did exercise that care, but if any of them exercised the care which should have been exercised in a case of this kind, then de-

fendant is not negligent. It is not my province to comment upon the testimony. I will merely say that if Mrs. Ranney signaled to these men in time so that, if they had been observing her, if they had been looking out for danger of any kind, they could have seen her and could have stopped the train, then they would have been negligent. But you have to take into consideration in these matters the time when Mrs. Ranney signaled to them."

Particular emphasis is laid upon so much of the instruction quoted as begins with the words, "It is not my province."

The court advised the jury there was no testimony showing that any of the switching crew saw the child under the car before he was injured, and that it was not the duty of the defendant to inspect the standing cars before moving its engine on the track and making the coupling. They were advised, also, that in order to sustain the theory of the plaintiff they must find that the servants of defendant were negligent "in the manner of attaching the engine to those standing cars." They were further advised that it was immaterial whether the bell was rung as the engine moved in to make the coupling or whether the whistle was sounded before reaching Beaver street. The court did not otherwise than is here stated eliminate, or withdraw from the attention of the jury, the negligence of defendant alleged in the declaration and to which testimony had been directed. In stating the theory of the parties, it was said:

"And it is the theory of the plaintiff that, while the defendant was connecting those flat cars with an engine, they were so negligent in their conduct of that engine that they failed, because of that negligence, to know that a child was under one of the cars, and the child was injured thereby."

The theory of defendant was stated in these words:

"It is the theory of the defendant railroad company

that they came down across Beaver street, ringing the bell and giving the usual signals, that the men in charge of the engine were careful and prudent men, trained railroad men, and that they exercised due diligence and care."

Exceptions were taken also to the rulings which permitted plaintiff, after defendant had rested, to call two witnesses, not before sworn, to prove, among other things, that there was a car in front of the engine—being pushed by it. The objection was that it was not proper rebuttal. Upon these exceptions, error is assigned.

OSTRANDER, J. (*after stating the facts*). It is said in the brief for plaintiff—appellee—that—

"In view of the testimony and the law applicable, the case, when finally submitted to the jury, presented a clearcut issue of fact which may be stated as follows:

"Was the crew of the engine negligent while proceeding from the Beaver street crossing to the standing cars, in failing to heed or observe the warnings of danger given to stop the engine before hitting the standing cars, which resulted in the injury to plaintiff?

"On this issue of fact the jury found the defendant negligent. The court properly charged them on the law, calling attention to the main and decisive issue in language not at all unfavorable to defendant."

It is also said:

"The material issues in the case and to which the testimony was directed, were the operation of the engine, and the care, or lack of care, of its crew, from the Beaver street crossing up to the time of the coupling to the standing cars. The negligence claimed was the absence of a lookout on the gondola car, the failure to observe and heed the warning cries and gestures of Mrs. Ranney, and to bring the engine to a stop before attaching it to the standing cars, and which caused an injury to plaintiff, there being ample time to do so and

avoid the accident, if the defendant was not negligent and careless in respect to the operation of its engine under the circumstances."

An examination and analysis of the pleadings and of all the testimony makes it apparent that when the taking of testimony was concluded plaintiff's case rested upon the proposition that actionable negligence was made out because some of the switching crew did not sooner observe and understand the actions and calls, or exclamations, of the witness Ranney, assuming that the jury believed her testimony to be true, and stop the movement of the engine before it reached the standing cars. The court might very properly have eliminated and removed from the consideration of the jury every other charge of negligence, because it does not appear that any other alleged negligent act contributed to the injury of plaintiff.

Regarding the testimony most favorable to the plaintiff, it appears that the theater of action was small, and possible action was measured by seconds of time. Called upon to determine so narrow an issue, the jury was told that—

"If Mrs. Ranney signaled to these men in time so that, if they had been observing her, if they had been looking out for danger of any kind, they could have seen her and could have stopped the train, then they would have been negligent."

This is the only application which was made by the court of the law to the facts, the only specification of what would be negligent conduct on the part of defendant's servants. See, generally, *Linstrand* v. *Lumber Co.*, 65 Mich. 254; *Schindler* v. *Railway Co.*, 77 Mich. 136; *Anderson* v. *Boom Co.*, 57 Mich. 216; *Heller* v. *Railway Co.*, 109 Mich. 53 (63 Am. St. Rep. 541); *Huggett* v. *Erb*, 182 Mich. 524 (Ann. Cas. 1916B, 352).

This instruction does not state the measure of the duty of defendant in the circumstances. It does not

leave to the jury any question of disputed fact. That Mrs. Ranney *could* have been seen and in time to have stopped the engine is not a disputed fact. Whether she stood upon the porch of her house or ran towards the engine, she was within the range of the vision of defendant's servants. If the jury believed her, she signaled,—cried out, waved her hands, advanced towards the engine and its crew,—at a time when, if she was observed and understood, the engine could have been stopped. Obviously, the duty of the switching crew was to observe the cars they were approaching, and any knowledge they may have possessed that children were sometimes on the right of way would naturally cause observation to be directed towards the standing cars.

Beyond this, we think the measure of their duty, stated abstractly, was to heed notices and warnings of danger and peril observed and understood by them, and, reference being had to the work they were doing, they should have observed in this connection those things which the ordinarily prudent person about the same work would have observed. Manifestly, in order to fix defendant's liability, the duty must have arisen and have been disregarded at a time when, by prudent conduct, injury could have been avoided. Applied to the circumstances disclosed in this case, the rule does not require that defendant's servants search, with their eyes, the porches of the houses in view for signals of danger, nor that they should apprehend peril, because some one was, or appeared to be, waving to them. If Mrs. Ranney's actions were observed and their meaning understood, the engine should have been stopped as soon as it was reasonably possible to stop it. If Mrs. Ranney's actions were so plainly in view, her person so near to the right of way, her purpose so evident, that a member of the switching crew, exercising ordinary care in performing his duty, would

have observed and understood her, the engine should have been stopped.

The case is so close a one upon the. facts,—there being so much convincing testimony supporting the conclusion that defendant's servants were guilty of no negligence — that the charge of the court complained about may be supposed to have largely influenced the jury in arriving at a verdict. And as the instruction cannot, for reasons stated, be approved, the judgment must be set aside and a new trial granted. The court might well have given defendant's ninth preferred instruction, or its equivalent. It was not error to refuse the other preferred requests above set out.

We do not consider other assigned errors, it appearing that they raise questions, none of which need arise, or are likely to arise, upon a new trial. With costs to appellant.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.